# EXHIBIT 7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE BIG HEART PET BRANDS LITIGATION, | Case No.  18-cv-00861-JSW |
| | **REDACTED ORDER GRANTING, IN PART, AND DENYING, IN PART, MOTION TO DISMISS SECOND AMENDED CONSOLIDATED COMPLAINT** |
| This document relates to all actions. | Re: Dkt. No. 128 |

Now before the Court for consideration is the motion to dismiss filed by Big Heart Pet Brands, Inc. ("Defendant").  The Court has reviewed the parties' papers, relevant legal authority, and the record in this case, and the Court hereby GRANTS, IN PART, AND DENIES, IN PART, Defendant's motion.

# TABLE OF CONTENTS

BACKGROUND ............................................................................................. 1

ANALYSIS ................................................................................................. 5

A.    Article III Standing.......................................................................... 5

    1.    Legal Standard..................................................................... 5

    2.    Standing for Injunctive Relief. ............................................ 6

    3.    Standing to Pursue Their Claims. ....................................... 10

    4.    Standing of Non-California Plaintiffs. ................................ 13

B.    Article III Mootness. ...................................................................... 14

C.    Personal Jurisdiction....................................................................... 15

    1.    Legal Standard..................................................................... 15

    2.    *Bristol-Myers Squibb*. ........................................................ 16

D.    Failure to Plead Fraud with Particularity....................................... 20

E.    Failure to State Claims for Relief. .................................................. 22

    1.    Legal Standard..................................................................... 22

    2.    Consumer Protection Claims............................................... 22

        a.    Statutory standing..................................................... 23

        b.    Misrepresentation theory. ......................................... 27

        c.    Omission theory. ....................................................... 29

        d.    Unfair, immoral, and unscrupulous conduct............. 36

        e.    Unlawful conduct. ..................................................... 38

        f.    Minnesota claims. ..................................................... 38

        g.    Reliance and causation. ............................................ 41

United States District Court
Northern District of California

i

3.   Express Warranty Claims...................................................................... 43

    a.   Basis of their bargain............................................................ 43

    b.   Damages. ................................................................................ 45

4.   Implied Warranty Claims. ................................................................... 45

5.   Fraud Claims. ...................................................................................... 50

    a.   Reliance and causation. ......................................................... 51

    b.   Knowledge. ............................................................................. 51

6.   Negligence Claim. ............................................................................... 52

    a.   Economic loss rule. ................................................................ 52

7.   Adequacy of Remedy at Law. .............................................................. 54

8.   Punitive Damages. ............................................................................... 56

9.   Choice-of-Law..................................................................................... 57

CONCLUSION ........................................................................................................ 59

United States District Court
Northern District of California

**BACKGROUND**[1]

This lawsuit began with a single news report in early February 2018. (Dkt. No. 121, Second Amended Consolidated Complaint ("SACC") ¶ 11.) WJLA, an ABC network affiliate, reported that an independent investigation uncovered the presence of pentobarbital—a barbiturate commonly used as a sedative, anesthetic, and euthanizing agent for animals—in several dog food products manufactured, advertised, and sold by Defendant.[2] (*Id.* ¶ 1, 2, 11.) Pentobarbital can cause health problems in pets, including death. (*See, e.g., id.* ¶¶ 2-3, 6-8.) Plaintiffs allege there is no safe level for pentobarbital in pet foods. (*Id.* ¶¶ 3, 5, 8.)

███████████████████████████████████████████████ (*See id.* ¶¶ 17, 44-45.) Two decades ago, a Food and Drug Administration analysis found residue of pentobarbital in many of Defendant's products, some of which are at issue here. (*Id.* ¶ 42.) ████████████████████████████ (*See id.* ¶¶ 17, 44.) ████████████ ███████████████████████████████████████ (*Id.* ¶ 44.) ███████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████ (*Id.*) █ ███████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████ (*Id.* ¶ 45.)

---

[1]     On October 4, 2019, the Court granted, in part, and denied, in part, Defendant's motion to dismiss Plaintiffs' Amended Consolidated Complaint. *See In re Big Heart Pet Brands Litig.*, No. 18-cv-00861-JSW, 2019 WL 8266869, at *1 (N.D. Cal. Oct. 4, 2019). In light of the number of claims and issues presented, the Court will once again set forth a detailed statement of Plaintiffs' allegations.

[2]     The products at issue are listed in paragraph 2 of the SACC, and the Court shall refer to them as "Contaminated Dog Foods."

United States District Court
Northern District of California

1 ███████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ███████████████████████████████████████████████████████████

4 ████████████████████████████████████████ (*Id.* ¶ 46) (emphasis omitted). ████████████

5 ████████████████████████████████████████████████████

6 █████████████████████ (*Id.* ¶ 47.)

Fast forward six months, Defendant issued several press releases as result of the public exposure arising from WJLA's news report. (*Id.* ¶¶ 13-16, Exs. A-D.) Plaintiffs allege Defendant's changes to the content of the press releases suggests it knew the Contaminated Dog Foods were contaminated with pentobarbital. (*Id.* ¶ 18.) In its first press release, four days after the news story broke, Defendant assured the public that its products were safe but mentioned that pentobarbital could unintentionally be in the raw ingredients used to produce the Contaminated Dog Foods. (*Id.* ¶ 14.) Defendant implied that was unlikely, however, because it regularly audited its suppliers to ensure its products do not contain pentobarbital. (*Id.* ¶ 14.) Soon after, Defendant voluntarily withdrew some of its products, including the products at issue here. (*Id.* ¶¶ 20-21, Ex. A.) Defendant issued its second press release on February 23, 2018, stating it had conducted independent testing and discovered beef fat as the source of the pentobarbital contamination. (*Id.* ¶ 22, Ex. C.) Exactly a week later, Defendant issued its last press release, informing the public that additional laboratory tests revealed that pentobarbital was present in animal fat from cows, pigs, and chickens. (*Id.* ¶ 28, Ex. D.) On that same day, the Food and Drug Administration formally recalled the Contaminated Dog Foods. (*Id.* ¶ 30.)

Plaintiffs allege the materials used to manufacture the Contaminated Dog Foods came from one supplier—JBS—and its rendering facility MOPAC. (*Id.* ¶¶ 36-37.) According to Plaintiffs, it is publicly known that JBS works with meat byproducts, including euthanized horses. (*Id.* ¶¶ 36-37, Ex. E.) They further allege that JBS has been plagued by investigations, recalls, and other "red flag situations." (*Id.* ¶ 38-39.) Plaintiffs allege that a warning letter was sent to JBS on April 23, 2019, which concluded that JBS "failed to identify and exclude raw materials and ingredients containing pentobarbital' prior to March 2018." (*Id.* ¶ 40.) That same investigation

1    concluded that tallow samples JBS produced in 2017 and 2018 tested positive for pentobarbital.

2    (*Id.*)  According to Plaintiffs, an unidentified government agency determined that JBS continued

3    accepting "dead stock" until July 2018.  (*Id.*)

4         Plaintiffs allege Defendant's promise to enhance its safety and quality control are still

5    lacking.  (*Id.* ¶ 54.)  They point to Defendant's relatively recent recall of cat food due to unrelated

6    "health concerns" that allegedly "mirror those that result from ingestion of pentobarbital."  (*Id.*)

7    The recall does not identify pentobarbital as the problem associated with the cat food.  (*See id.*)

8         Plaintiffs are consumers who purchased Defendant's Contaminated Dog Foods.  (*Id.* ¶ 1-

9    2.)  According to them, they relied on many of Defendant's representations when deciding to

10   purchase its products.  The main focus of the parties' dispute involves the representation "100%

11   Complete & Balanced Nutrition" on the labels of the Contaminated Dog Foods.  (*See, e.g.,* ¶ 83.)

12   In the Amended Consolidated Complaint, Plaintiffs included 15 images of the Contaminated Dog

13   Foods of which only four contained the representation "100% Complete & Balanced Nutrition" on

14   the product itself.  (Dkt. No. 68, Amended Consolidated Complaint ¶ 113(k)-(n).)  The remaining

15   nine images did not contain this representation.  (*Id.* ¶ 113(a)-(j).)

16        In the SACC, Plaintiffs now include 18 images of the Contaminated Dog Foods, only six

17   of which contain the representation "100% Complete & Balanced Nutrition" on the product itself.

18   (SACC ¶ 122(m)-(r).)  Of the remaining 12 Contaminated Dog Food products, Plaintiffs

19   incorporate seven images of partial labels containing the representation "100% Complete &

20   Balanced Nutrition" below the full images of the corresponding Contaminated Dog Foods.[3]  (*See,*

21   *id.,* ¶ 122(a), (c), (e), (g), (h), (k), (l).)  In total, "100% Complete & Balanced Nutrition" appears

22   on 13 images of the 18 Contaminated Dog Foods, either on the product itself or on the partial

23   labels.  (*Id.* ¶¶ 122(a), (c), (e), (g), (h), (k), (l), (m), (n), (o), (p), (q), (r).)

24

25   [3]    These partial images had not appeared in Plaintiffs' previous versions of the complaint.
     (*See* Dkt. Nos. 1, 37, 68.)  The Court ordered the parties to submit supplemental briefing to
26   explain why these partial images were omitted from the previous complaints.  (Dkt. No. 149.)  In
     the supplemental briefing, Plaintiffs explain that these images were produced in discovery after the
27   Court issued its order granting, in part, and denying in part, Defendant's motion to dismiss.  (Dkt.
     No. 151.)  The parties dispute the validity of these images.  (*See id.*).  The Court addresses those
28   concerns in later sections.

United States District Court
Northern District of California

Plaintiffs allege Defendant "wrongfully advertised and sold the Contaminated Dog Foods as complete nutrition, quality, and healthy despite the presence of pentobarbital" and advertised the Contaminated Dog Foods as "100 percent complete and quality nutrition[.]" (*Id.* ¶¶ 58, 60.) Each Plaintiff alleges that either "because of" or "based on" Defendant's "false and misleading claims, warranties, representations, advertisements, and other marketing[,]" Plaintiffs were "unaware that the Contaminated Dog Foods contained any level of pentobarbital." (*Id.* ¶¶ 80, 83, 87, 90, 93, 96, 99, 102, 103, 106, 109.) All Plaintiffs, except Thomas, now allege that they "relied upon the '100 percent complete and balanced nutrition' claim when purchasing the Contaminated Dog Foods." (*Id.* ¶¶ 80, 83, 85, 90, 92, 96, 99, 102, 107, 111, 113, 117, 119.) According to them, Defendant intentionally failed to disclose that the Contaminated Dog Foods were adulterated. (*Id.* ¶¶ 57-59.)

Plaintiffs allege they suffered harm because they purchased a product of "no value or *de minimus* value" as they were contaminated with pentobarbital. (*Id.* ¶¶ 83, 87, 90, 93, 96, 99, 103, 106, 109, 111, 114, 117, 120.) Had they known the products contained pentobarbital, Plaintiffs allege they would not have purchased the products. (*Id.* ¶¶ 71, 81, 84, 88, 91, 94, 97, 100, 103, 106, 109, 112, 115, 118, 120.) Plaintiffs allege a desire to purchase the Contaminated Dog Foods in the future but claim they lack the necessary information to determine whether the products are no longer at risk for containing pentobarbital. (*Id.* ¶¶ 53, 166.) Plaintiffs also allege Defendant is not legally obligated to continue pentobarbital testing and could stop testing without consequence, leaving its consumers susceptible to purchasing products adulterated with pentobarbital. (*Id.* ¶ 53.) Without a court order requiring Defendant to test for pentobarbital and to disclose that it tests its products and that the products are not adulterated, Plaintiffs allege consumers will have no meaningful way of knowing whether Defendant's products are adulterated with pentobarbital. (*Id.* ¶ 53.)

The Court will address additional facts as necessary in the analysis.

## ANALYSIS

Once again, this Court must decide whether Plaintiffs' allegations can endure Defendant's challenges to justiciability, jurisdiction, and the sufficiency of the claims. To help provide clarity

and structure to the parties' arguments, the Court will first address the justiciability arguments on Article III standing and mootness.  Next, the Court will turn to Defendant's challenges to personal jurisdiction.  Then, it will turn to whether Plaintiffs' allegations meet the heightened pleading standards applicable to fraud claims.  Finally, the Court will discuss the arguments as to the sufficiency of the pleadings.

**A.      Article III Standing.**

Defendant makes three distinct challenges to Plaintiffs' Article III standing.  First, Defendant argues that Plaintiffs do not have standing to seek injunctive relief.  Second, Defendant argues that Plaintiffs lack standing to bring their claims because they fail to allege a particularized harm.  Finally, Defendant argues that the non-California named Plaintiffs and putative class members lack standing to bring their claims under California law.

**1.      Legal Standard.**

The Court evaluates challenges to Article III standing under Federal Rule of Civil Procedure 12(b)(1).[4]  *See Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011) (motion to dismiss for lack of standing governed by Rule 12(b)(1)).  Where, as here, a defendant makes a facial attack on jurisdiction, the factual allegations of the complaint are taken as true.  *Fed'n of African Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1207 (9th Cir. 1996).  Plaintiffs are then entitled to have those facts construed in the light most favorable to them.  *Id.*

The "irreducible constitutional minimum" of standing consists of three elements: an injury-in-fact, causation, and redressability.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) ("*Defs. of Wildlife*")).  Plaintiffs must prove each element with the same manner and degree of evidence required at each stage of the litigation.  *Defs. of Wildlife*, 504 U.S. at 561.  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'"  *Id.* at 561 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990) ("*Nat'l*

---

[4]      Unless otherwise noted, all future references to rules in this Order are to the Federal Rules of Civil Procedure.

United States District Court
Northern District of California

1    *Wildlife Fed'n*")).  Because Plaintiffs are the parties invoking federal jurisdiction, they "bear[] the

2    burden of establishing these elements."  *Id.*

3          In a class action, standing exists where at least one named plaintiff meets these

4    requirements.  *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 865 (9th Cir. 2014).  To

5    demonstrate standing, the "named plaintiffs who represent a class must allege and show they

6    personally have been injured, not that injury has been suffered by other, unidentified members of

7    the class to which they belong and which they purport to represent."  *Lewis v. Casey*, 518 U.S.

8    343, 347 (1996) (internal quotation marks omitted).  Moreover, at least one named plaintiff must

9    have standing with respect to each claim that the class representatives seek to bring.  *In re*

10   *Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1107 (N.D. Cal. 2007).

11         In the context of requests for injunctive relief, the standing inquiry requires Plaintiffs to

12   "demonstrate that [they have] suffered or [are] threatened with a 'concrete and particularized'

13   legal harm, coupled with a 'sufficient likelihood that [they] will again be wronged in a similar

14   way.'"  *Bates v. United Parcel Service, Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (quoting *Defs. of*

15   *Wildlife*, 504 U.S. at 560, and *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)).  The latter

16   inquiry turns on whether the plaintiff has a "real and immediate threat of repeated injury."  *Id.*

17   The threat of future injury cannot be "conjectural or hypothetical" but must be "certainly

18   impending" to constitute an injury-in-fact for injunctive relief purposes.  *Davidson v. Kimberly-*

19   *Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018).

20         **2.      Standing for Injunctive Relief.**

21         Defendant renews its argument that Plaintiffs lack standing to seek injunctive relief

22   because their allegations still fail to allege a real and immediate threat of repeated injury.  It

23   reasons that past instances of pentobarbital contamination and an unrelated recall of cat food are

24   too speculative to show they are likely to purchase a product containing pentobarbital again in the

25   future.  Plaintiffs disagree.  They argue that newly discovered evidence shows that Defendant's

26   prior failures to take adequate steps to eliminate the known risk of pentobarbital contamination in

27   the Contaminated Dog Foods show a real and immediate threat of repeated injury.  The Court

28   previously concluded that, as drafted, "Plaintiffs' allegations of future advertising injury based on

United States District Court
Northern District of California

the fact that Defendant['s] products contain pentobarbital are too speculative to demonstrate they are likely to be injured in the same way." *In re Big Heart*, 2019 WL 8266869, at *4. Upon further reflection, the Court revisits the issue of whether Plaintiffs have standing to seek injunctive relief.

The Court begins with a discussion of the Ninth Circuit's decision in *Davidson*. There, the defendant sold toilet wipes labeled as "flushable." *Davidson*, 889 F.3d at 961. Based on that representation, the plaintiff purchased the toilet wipes but later discovered they were not appropriate for disposal down a toilet. *Id.* at 961-62. The plaintiff alleged a desire to purchase the toilet wipes in the future, if it were possible to determine if they were suitable to be flushed. *Id.* She alleged, however, that she would be unable to tell based on the packaging whether the wipes were truly "flushable." *Id.*

The Ninth Circuit held the plaintiff's allegations showed "a sufficient likelihood that [s]he will again be wronged in a similar way" because she would be unable to rely on the defendant's representations that its toilet wipes were "flushable" in deciding whether to purchase the product in the future. *Id.* at 971-72. The Court recognized two circumstances where a consumer could suffer a harm because of her "inability to rely on the validity of the information advertised." *Id.* at 971. First, the Ninth Circuit explained that a plaintiff may show a threat of future harm because she plausibly alleges that she "will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although she would like to." *Id.* at 969-70. Second, in some cases, the threat of future injury will arise because a plaintiff can plausibly allege that she "might purchase the product in the future, despite the fact that it was once marred by false advertising or labeling, as she may reasonably, but incorrectly, assume the product was improved." *Id.* at 970. In either instance, the threat of future injury arises when a plaintiff's inability to rely on advertising is *combined* with a desire or intent to purchase the product again. Thus, the plaintiff would "face[] the similar injury of being unable to rely on [the defendant's] representations of its product in deciding whether or not she should purchase the product in the future." *Id.* at 971-72.

Thus, the proper inquiry under *Davidson* is whether Plaintiffs adequately allege that they will suffer a future harm from being unable to trust or rely on Defendant's advertising or labeling

7

United States District Court
Northern District of California

1    irrespective of the Contaminated Dog Food Products being contaminated with pentobarbital.

2    Here, Plaintiffs allege they purchased the Contaminated Dog Foods based on Defendant's

3    representation "100% Complete & Balanced Nutrition" but later discovered the products were

4    adulterated with pentobarbital.  Like the plaintiff in *Davidson*, Plaintiffs allege a desire to purchase

5    the Contaminated Dog Foods but cannot rely on the labeling of the products to determine whether

6    it is adulterated with pentobarbital.  (*See* SACC ¶¶ 53,166.)  Based on these allegations alone,

7    Plaintiffs adequately allege "a sufficient likelihood that [they] will again be wronged in a similar

8    way" because they are unable to rely on Defendant's representations on its Contaminated Dog

9    Foods in deciding whether to purchase the products in the future.  *Lyons*, 461 U.S. at 111; *see also*

10   *Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 533 (N.D. Cal. 2012) ("Should plaintiffs

11   encounter the denomination 'All Natural' on an AriZona beverage at the grocery store today, they

12   could not rely on that representation with any confidence.")).

13        The threat of repeated injury is further bolstered by Plaintiffs' new allegations that

14   Defendant repeatedly failed to prevent pentobarbital contamination of its dog foods in the past,

15   some of which are at issue here.[5]  Specifically, they rely on the hazard analysis meeting where

16   Defendant allegedly acknowledged the risks pentobarbital posed to its products and the document

17   where it further cautioned about the risks of pentobarbital contamination and called for immediate

18   action.  Plaintiffs claim that after all that, Defendant declined to take any further preventative

19   measures.  Plaintiffs couple these allegations with the fact that the Contaminated Dog Foods had

20   previously been contaminated with pentobarbital and that it knows its product supplier, JBS, uses

21   products that increase the risk of such contamination.  Based on these allegations, the Court

22   concludes that Plaintiffs "face[] the similar injury of being unable to rely on [Defendant's]

23

24   _____

     [5]      Plaintiffs also rely on the allegation that Defendant continues to sell the Contaminated Dog
25   Foods even after it recently recalled its cat food.  Plaintiffs reliance on this fact is unavailing
     because they do not allege the recall of cat food was the result of pentobarbital contamination, nor
26   is it plausible to infer that.  *See, e.g., Vavak v. Abbott Labs., Inc.*, No. SACV 10-1995 JVS (RZx),
     2011 WL 10550065, at *4 (C.D. Cal. July 20, 2011) (dismissing prayer for injunctive relief where
27   plaintiff could not show a real or immediate threat of repeated injury based on allegations of
     recalls of unrelated products other than those at issue)).
28

                                              8

United States District Court
Northern District of California

1  representations of its products in deciding whether or not [they] should purchase the product[s] in

2  the future." *Davidson*, 889 F.3d at 972.

3        Plaintiffs also adequately allege an injury-in-fact.  An injury-in-fact is one that is "concrete

4  and particularized" and "actual or imminent, not conjectural or hypothetical."  *Defs. of Wildlife*,

5  504 U.S. at 560 (internal quotation marks omitted).  Plaintiffs allege a concrete future harm

6  because of their inability to rely on the validity of the information on the Contaminated Dog Foods

7  in assessing whether to purchase those products in the future.  *See Davidson*, 889 F.3d at 971

8  (finding the plaintiff adequately alleged a concrete harm because of her "inability to rely on the

9  validity of the information advertised on Kimberly-Clark's wipes despite her desire to purchase

10  truly flushable wipes."); *see also Wilderness Soc., Inc. v. Rey*, 622 F.3d at 1251, 1258 (9th Cir.

11  2010) (discussing how an informational injury may constitute an injury-in-fact for Article III

12  standing).  Plaintiffs also allege a particularized future injury because they would be affected in a

13  personal and individual way if, as consumers, they could not rely on Defendant's representations

14  on the Contaminated Dog Foods.  *See Spokeo*,136 S. Ct. at 1548 ("For an injury to be

15  'particularized,' it 'must affect the plaintiff in a personal and individual way.'") (quoting *Defs. of*

16  *Wildlife*, 504 U.S. at 560 n.1.); *see also Davidson*, 889 F.3d at 971 (finding the plaintiff's inability

17  to rely on the defendant's representations as a future consumer affects her in a personal and

18  individual way)).

19        Plaintiffs also adequately allege a future harm that is actual and imminent.  A previously

20  deceived consumer may suffer an actual and imminent harm by not being able to rely on a

21  defendant's labels in the future.  *Davidson*, 889 F.3d at 967.  Here, Plaintiffs allege the

22  representation "100% Complete & Balanced Nutrition" deceived them into purchasing the

23  Contaminated Dog Foods.  Although they desire to purchase these products in the future, they

24  cannot rely on Defendant's representations absent corrective marketing.

25        With regard to redressability, Defendant argues Plaintiffs' future harm cannot be redressed

26  by an injunction because the Court cannot affirmatively monitor Defendant's manufacturing

27  process.  However, Plaintiffs do not request an injunction that would require the Court to actively

28  monitor Defendant's manufacturing process.  Rather, Plaintiffs request an injunction that would

require Defendant to adequately test for pentobarbital and to "disclos[e] on its packaging that its products are tested to ensure that they are not adulterated." (Prayer for Relief, ¶ D.) This injunctive relief would likely redress Plaintiffs' alleged injury by requiring Defendant to disclose that the products are properly tested and do not contain pentobarbital upon which Plaintiffs can rely. *See also Ries*, 287 F.R.D. at 534 (finding that corrective advertising could redress the plaintiff's harm of being unable to rely on the defendant's representation)). Accordingly, the Court concludes the Plaintiffs' requested injunctive relief could redress their alleged future harms.

Accordingly, the Court DENIES, IN PART, Defendant's motion to dismiss Plaintiffs' request for injunctive relief for lack of standing.

### 3. Standing to Pursue Their Claims.

Defendant also argues Plaintiffs lack standing to bring their claims because they did not suffer a particularized injury when they purchased the Contaminated Dog Foods. Defendant asserts that Plaintiffs fail to allege that the products they purchased were contaminated with pentobarbital but instead improperly rely on an overinclusive recall that withdrew products that were potentially affected.

A particularized injury is one that "'must affect the plaintiff in a personal and individual way.'" *Dutta v. State Farm Mut. Auto. Ins. Co.*, 895 F.3d 1166, 1173 (9th Cir. 2018) (quoting *Defs. of Wildlife*, 504 U.S. at 560 n.1)). A plaintiff suffers an economic injury when she purchased a product she otherwise would not have had the defendant made the proper disclosures. *See Maya*, 658 F.3d 1060, 1069 (9th Cir. 2011). "This is a quintessential injury-in-fact." *Id.*; *see also Rice-Sherman v. Big Heart Pet Brands, Inc.*, No. 19-cv-03613-WHO, 2020 WL 1245130, at *6-7 (N.D. Cal. Mar. 16, 2020) (finding plaintiffs sufficiently pled Article III standing where they purchased dog food relying upon defendant's claim its products were free of any grains, corn, or soy protein and would not have purchased the products had they known it contained those ingredients); *McCoy v. Nestle USA, Inc.*, 173 F. Supp. 3d 954, 964 (N.D. Cal. 2016) ("In this Court's view, if a customer has paid a premium for an assurance that a product meets certain standards, and the assurance turns out to be meaningless, the premium that the customer has paid is an actual, personal, particularized injury that is cognizable under Article III.")).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Here, Defendant marketed and sold its products as "100% Complete & Balanced

2  Nutrition."  All Plaintiffs, except Mayo and Jilek, relied on those representations and assumed that

3  the products were unadulterated.  Yet, according to Plaintiffs, testing from multiple sources

4  confirmed the presence of pentobarbital in the Contaminated Dog Foods.  Plaintiffs allege they

5  were harmed by purchasing a product "that had no value or *de minimus* value as they were

6  adulterated," (*see, e.g.,* SACC ¶ 83), and had they known about the contamination, they would not

7  have purchased the products, (*see, e.g., id.* ¶ 81).  This is a "quintessential injury-in-fact." *Maya*,

8  658 F.3d at 1069.  Thus, Plaintiffs sufficiently allege a particularized injury that affected them "'in

9  a personal and individual way.'" *Dutta*, 895 F.3d at 1173 (quoting *Defs. of Wildlife*, 504 U.S. at

10  560)).

11    The Court is also not persuaded by *Pels v. Keurig Dr. Pepper, Inc.*, 19-cv-03052-SI, 2019

12  WL 5813422, at *1 (N.D. Cal. Nov. 7, 2019) on which Defendant relies.  In *Pels*, the district court

13  held the plaintiff claimed the defendant's labeling of its water as "mineral spring water" was

14  misleading because it allegedly contained arsenic. 2019 WL 5813422, at *1.  The defendant

15  argued that the plaintiff failed to allege that the water *he* purchased contained arsenic.  *Id.* at *4.

16  The plaintiff argued that *all* of Defendant's water, including the water he purchased, contained

17  arsenic because it all came from the same source. *Id.* at *5.  The district court rejected the

18  plaintiff's argument, explaining that nowhere in the complaint did the plaintiff make such a

19  straightforward allegation that *all* the defendant's water was contaminated.  *Id.*  Here, unlike the

20  allegations in *Pels*, Plaintiffs straightforwardly allege that all the Contaminated Dog Foods were

21  contaminated with pentobarbital.  (*See* SACC ¶ 2.)

22    The Court also finds unavailing Defendant's reliance on *Gaminde v. Lang Pharma*

23  *Nutrition, Inc.*, 1:18-cv-300 (GLS/DEP), 2019 WL 1338724, at *1 (N.D.N.Y. Mar. 25, 2019).  In

24  *Gaminde*, the plaintiff purchased a bottle of the defendant's Krill Oil, which purported to contain

25  300 mg of Omega-3 Krill Oil.  2019 WL 1338724, at *1.  A single government study revealed that

26  two of the defendant's bottles contained less than 300 mg of Omega-3 Krill Oil.  *Id.*  The district

27  court held the plaintiff failed to allege a particularized harm, reasoning that he did not show that

28  the bottle he purchased contained less than 300 mg of Omega-3 Krill Oil.  *Id.* at *2.  It is

11

United States District Court
Northern District of California

1   speculation, the court explained, to infer that because two bottles had less than 300 mg that all

2   bottles had less than 300 mg.  *Id.*

3          Unlike in *Gaminde*, Plaintiffs do not rely on a single study in alleging the Contaminated

4   Dog Foods contained pentobarbital.  Instead, Plaintiffs allege that three sets of tests uncovered the

5   presence of pentobarbital in Defendant's Contaminated Dog Foods.  The first set of tests were

6   conducted as part of the WJLA's news report.  (SACC ¶ 11.)  According to Plaintiffs, two

7   independent laboratories tested the Contaminated Dog Foods, which tested positive for

8   pentobarbital.  (*Id.*)  The second set of tests were initiated by Defendant and conducted by an

9   independent, third-party microbiology laboratory.  (*Id.* ¶ 22.)  Those tests also revealed the

10  presence of pentobarbital in the Contaminated Dog Foods.  (*Id.*)  The last set of tests were also

11  initiated by Defendant.  (*See id.* ¶ 26.)  According to Plaintiffs, those tests again confirmed the

12  presence of pentobarbital in the Contaminated Dog Foods but revealed the sources of the

13  contamination were more expansive than Defendant initially publicized.  (*Id.* ¶¶ 26, 28.)  In

14  addition, Plaintiffs allege that the ingredients used to produce the Contaminated Dog Foods came

15  from Defendant's sole supplier, JBS, (*id.* ¶¶ 36-37), who failed to identify and exclude raw

16  materials that contained pentobarbital before March 2018.  (*Id.* ¶ 40.)  ████████████████

17  ████████████████████████████████████████████████████████████████████████████

18  ███████████████████████  (*Id.* ¶¶ 45-47.)  Plaintiffs thus allege Defendant's recall of all the

19  Contaminated Dog Foods is an admission that the products were contaminated with pentobarbital.

20  (*See* SACC ¶¶ 14, Ex. C.)  Based on these allegations, the Court concludes it is fair to infer that

21  the Contaminated Dog Foods purchased by Plaintiffs were contaminated with pentobarbital.

22          The Court concludes, however, that neither Mayo nor Jilek sufficiently allege a

23  particularized harm.  Mayo alleges she purchased the Gravy Train with Chicken Chunks and

24  Gravy Train with Beef Chunks flavors.  (*Id.* ¶ 110.)  Jilek alleges she purchased the Gravy Train

25  with Beef Chunks, Gravy Train with Chicken Chunks, and Gravy Train Meaty Ground Dinner

26  with Beef and Bacon flavors.  (*Id.* ¶ 116.)  Neither of them allege those products contained the

27  representation "100% Complete & Balanced Nutrition," nor does the statement appear on the

28  images of the Contaminated Dog Foods.  While a plaintiff suffers a "quintessential injury-in-fact"

1   if they allege they spent money that they would not have spent, absent the defendant's actions, .

2   *Rice-Sherman*, 2020 WL 1245130 at *6, the Court cannot conclude Mayo or Jilek suffered such an

3   economic injury if Defendant never made the representation they allegedly relied on in making

4   their purchases.

5        Accordingly, the Court GRANTS, IN PART, AND DENIES, IN PART, Defendant's

6   motion to dismiss Plaintiffs' claims for failure to allege a particularized harm.

7        **4.     Standing of Non-California Plaintiffs.**

8        Finally, Defendant argues the non-California named Plaintiffs and non-California putative

9   class members lack standing to bring their claims under California law because none of them lived

10   here or suffered an intrastate harm.

11        The Court concludes Defendant's challenge to the putative class members' standing is

12   premature.  At the motion to dismiss stage, Plaintiffs need not establish standing for the non-

13   California putative class members.  *See Ramirez v. Transunion LLC*, 951 F.3d 1008, 1023 (9th

14   Cir. 2020).

15        The remaining issue is whether the non-California named Plaintiffs have standing to bring

16   their claims under California law.  Defendant relies on *In re Capacitors Antitrust Litig.*, 154 F.

17   Supp. 3d 918 (N.D. Cal. 2015) for the proposition that nonresident plaintiffs lack standing to bring

18   claims in a state in which they do not reside or when they have suffered an intrastate harm.  In *In

19   re Capacitors*, a subset of five named plaintiffs sued the defendants for violating antitrust and

20   consumer protection statutes under the laws of 32 different states.  *Id.* at 922-23.  The district court

21   held the plaintiffs lacked Article III standing to bring claims under 31 of those states because none

22   of the named plaintiffs resided in or were harmed in those states.  *Id.* at 927-28.

23        Here, unlike *In re Capacitors*, there is at least one named Plaintiff, Wahl, who alleges he

24   resides in and was harmed in California.  Because standing exists so long as at least one named

25   plaintiff meets the requirements for standing, *Ollier*, 768 F.3d at 865, and Wahl has standing to

26   bring a California claim, the non-resident named Plaintiffs need not independently establish

27   standing to bring claims under California law.

28        Accordingly, the Court DENIES, IN PART, Defendant's motion to dismiss on this basis as

United States District Court
Northern District of California

well.

**B.     Article III Mootness.**

Defendant moves to dismiss Plaintiffs' request for injunctive relief on the basis that it undertook remedial measures.  Although Defendant again raises this argument in the context of its Article III standing argument, the Court finds it more doctrinally sensible to analyze it under Article III mootness.[6]  *In re Big Heart*, 2019 WL 8266869, at *4.  A case is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969); *see also Los Angeles Cty. v. Davis*, 440 U.S. 625, 631 (1979) (holding a case is moot if "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation")).  If "an opposing party has agreed to everything the other party has demanded," the case may be considered moot.  *GCB Commc'ns, Inc. v. U.S. Commc'ns, Inc.*, 650 F.3d 1257, 1267 (9th Cir. 2011); *see also Tosh-Surryhne v. Abbott Labs., Inc.*, No. CIV S-10-2603 KJM-EFB, 2011 WL 4500880, at *3 (E.D. Cal. Sep. 27, 2011).

The Court previously rejected Defendant's argument, concluding "that Plaintiffs seek injunctive relief that goes beyond asking for a recall . . . which could be addressed if they were to prevail," noting the scope of what corrective measures Plaintiffs sought was undefined.  *In re Big Heart*, 2019 WL 8266869, at *5.  Plaintiffs now request an order that would require Defendant to "adequately test[] for pentobarbital moving forward, and disclos[e] on its packaging that its products are tested to ensure that they are not adulterated."  (Prayer for Relief, ¶ D.)  Though Defendant has taken remedial measures, Plaintiffs request a corrective advertising campaign that goes beyond what Defendant has already done.  The viability of Plaintiffs' request is a question for a later day.

Accordingly, the Court DENIES, IN PART, Defendant's motion to dismiss Plaintiffs' request for injunctive relief on this basis as well.

---

[6]     Even if analyzed under the redressability prong of Article III standing, Plaintiffs adequately allege facts to show "a favorable ruling would likely provide redress for [their] alleged injur[ies]."  *Davidson*, 889 F.3d at 972.

14

United States District Court
Northern District of California

## C.    Personal Jurisdiction.

Defendant moves to dismiss the non-California putative class members for lack of specific and general personal jurisdiction.  The Court evaluates this argument under Rule 12(b)(2).

### 1.    Legal Standard.

The Court's focus when evaluating personal jurisdiction is the defendant's relationship to the forum state.  *Bristol-Myers Squibb Co. v. Superior Court of California*, 137 S. Ct 1773, 1779 (2017).  "Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons."  *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014).  California's long-arm statute allows for the exercise of personal jurisdiction to the full extent under the United States Constitution, so the Court's "inquiry centers on whether exercising jurisdiction comports with due process."  *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015); *see also* Cal. Civ. Proc. Code. § 410.10 ("A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States.")).

Due process requires a defendant have "minimum contacts" with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).  The strength of those contacts will determine whether a court can exercise general jurisdiction or specific jurisdiction.  *Picot*, 780 F.3d at 1211.  If a defendant's contacts are so "continuous and systematic as to render a defendant essentially at home in the forum state and amenable to any suit there," a court may exercise general personal jurisdiction.  *Glob. Commodities Trading Grp. Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101 (9th Cir. 2020).  A corporation is typically considered at home at its place of incorporation and at its principal place of business.  *Daimler*, 571 U.S. at 137.  While a court is not limited to exercising general jurisdiction in these forums, only in exceptional cases will it be allowed to do so otherwise.  *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1558 (2017).

Specific jurisdiction is different.  A court may exercise specific jurisdiction if the claims "aris[e] out of or relat[e] to the defendant's contacts with the forum."  *Daimler*, 571 U.S. at 127 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)).  This

"depends on an 'affiliatio[n] between the forum and the underlying controversy,' principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919.  Because Defendant moves to dismiss the SACC for lack of personal jurisdiction, Plaintiffs "bear[] the burden of demonstrating that jurisdiction is appropriate." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2000).  Because Defendant's motion to dismiss is based on a written record without an evidentiary hearing, Plaintiffs "need only make a prima facie showing of jurisdictional facts." *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990).

**2.   *Bristol-Myers Squibb*.**

Defendant argues the Court lacks specific jurisdiction because there is no connection between the non-California putative class members' claims and California as they have neither purchased the Contaminated Dog Foods, used them, or were injured by them in California. Defendant relies on the Supreme Court's opinion in *Bristol-Myers Squibb Company v. Superior Court of California*. 137 S. Ct. at 1779 ("*BMS*").

In *BMS*, a group of plaintiffs brought a mass-tort action against the pharmaceutical company Bristol-Myers Squibb, alleging injuries caused by the defendant's drug Plavix. *Id.* at 1777-78.  While all the plaintiffs' claims were brought under California law, most of the plaintiffs did not reside in California. *Id.* at 1778.  BMS was a Delaware corporation and headquartered in New York. *Id.*  BMS sold Plavix in California but engaged in most other activities in New York or New Jersey. *Id.*

BMS argued, as Defendant does here, that the state trial court lacked personal jurisdiction because the plaintiffs were not residents of California, nor did they purchase, use, or suffer injury by Plavix in California. *Id.*  The Supreme Court agreed and clarified that specific jurisdiction requires "an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Id.* at 1780 (quoting *Goodyear*, 564 U.S. at 919)).  In other words, specific jurisdiction requires an "adequate link between the State and the nonresidents' claims," a link the Supreme Court found missing. *Id.* at 1781.  The Supreme Court further explained that the

16

1   nonresident plaintiffs could not piggy-back off the resident plaintiffs' claims to sustain

2   jurisdiction, even though they were similar.  *Id.*

3          The Supreme Court's opinion, however, left unresolved whether *BMS* applies to class

4   actions.  Writing for the majority, Justice Alito noted, "since our decision concerns the due

5   process limits on the exercise of specific jurisdiction by a State, we leave open the question

6   whether the Fifth Amendment imposes the same restriction on the exercise of personal jurisdiction

7   by a federal court."  *Id.* at 1783-84.  Justice Sotomayor, in her dissent, further expounded: "[T]he

8   Court today does not confront the question whether its opinion here would also apply to a class

9   action in which a plaintiff injured in the forum State seeks to represent a nationwide class of

10  plaintiffs, not all of whom were injured there."  *Id.* at 1789 n.4 (Sotomayor, J., dissenting).

11         District courts have split on the question of whether *BMS* applies in class actions with

12  respect to claims brought by putative class members.  *Compare Carpenter v. PetSmart, Inc.*, 441

13  F. Supp. 3d 1028, 1035-36 (S.D. Cal. 2020) (holding "[*BMS*] applies in the nationwide class

14  action context" and finding personal jurisdiction could not be exercised over PetSmart for the non-

15  resident putative class members' claims); *Chavez v. Church & Dwight Co., Inc.*, No. 17 C 1948,

16  2018 WL 2238191, at *11 (N.D. Ill. May 16, 2018) (concluding *BMS* "extends to class actions,

17  and that Chavez is therefore foreclosed from representing either a nationwide and multistate class

18  comprising non-Illinois residents in this suit"); *Wenokur v. AXA Equitable Life Ins. Co.*, No. CV-

19  17-00165-PHX-DLR, 2017 WL 4357916, at *4 n.4 (D. Ariz. Oct. 2, 2017) (citing *BMS* and noting

20  that the court lacked "personal jurisdiction over the claims of putative class members with no

21  connection to Arizona"), *with Santos v. CarMax Bus. Servs., LLC*, No. 17-cv-02447-RS, 2018 WL

22  7916823, at *5 (N.D. Cal. May 8, 2018) ("[*BMS*] will not be construed to bar this Court's

23  jurisdiction over CarMax with respect to the non-California putative nationwide class members.");

24  *Sotomayor v. Bank of Am., N.A.*, 377 F. Supp. 3d 1034, 1038 (C.D. Cal. 2019) ("[T]he Court

25  declines to extend [*BMS*] to the class action context."); *Fitzhenry-Russell v. Dr. Pepper Snapple

26  Grp., Inc.*, Case No. 17-cv-00564 NC, 2017 WL 4224723, *5 (N.D. Cal. Sep. 22, 2017) (holding

27  *BMS* does not apply to the class action context and finding it "has personal jurisdiction over Dr.

28  Pepper as to the putative nationwide class claims")).

Case 4:21-cv-00863-YGR   Document 10-9   Filed 06/29/21   Page 22 of 63

To date, only the Fifth, Seventh, and D.C. Circuits have weighed in on this issue.  *See Mussat v. IQVIA, Inc.*, 953 F.3d 441 (7th Cir. 2020); *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240 (5th Cir. 2020); and *Molock v. Whole Foods Mkt. Grp., Inc.*, 952 F.3d 293 (D.C. Cir. 2020).  Like most district courts, the Seventh Circuit in *Mussat* held that *BMS* does not apply to class actions.  953 F.3d at 447-48.  The D.C. Circuit and Fifth Circuit stopped short of deciding the merits of the issue and addressed a different question: in a class action, at what point may a defendant raise the defense of lack of personal jurisdiction as to putative class members?  Both courts held that a defendant cannot bring a challenge for lack of personal jurisdiction based on claims of putative class members until after class certification.  *See Cruson*, 954 F.3d at 250; *Molock*, 952 F.3d at 298.

In *Molock*, former Whole Foods employees brought various state law claims against Whole Foods, a Delaware corporation headquartered in Texas, seeking to recover allegedly lost wages.  952 F.3d at 295.  The employees brought individual and putative class claims on behalf of past and present employees.  *Id.*  Prior to class certification, Whole Foods moved to dismiss for lack of personal jurisdiction relying on *BMS*.  *Id.*  The D.C. Circuit concluded that consideration of the defendant's motion was premature.  *Id.* at 298.  Central to the court's opinion was the unnamed plaintiffs' classification as "parties."  *See id.* at 296-98.  The court explained that the label "party" "does not indicate an absolute characteristic, but rather a conclusion about the applicability of various procedural rules that may differ based on context."  *Id.* at 297 (quoting *Devlin v. Scardelletti*, 536 U.S. 1, 10 (2002)).  In *certified* class actions, unnamed class members "'may be parties for some purposes and not for others.'"  *Id.* (quoting *Devlin*, 536 U.S. at 9-10)).

The court elaborated, however, that unlike *certified* class members, *putative* class members "are *always* treated as nonparties."  *Id.* at 297.  Finding authority in the Supreme Court's opinion in *Smith v. Bayer Corporation*, 564 U.S. 299 (2011), the D.C. Circuit concluded that "[p]utative class members become parties to an action—and thus subject to dismissal—only after class certification."  *Molock*, 952 F.3d at 297; *see also Smith*, 564 U.S. at 318 ("[T]he mere proposal of a class . . . could not bind persons who are not parties[.]")).  The court explained, "[i]t is class certification that brings unnamed class members into the action and triggers due process

18

United States District Court
Northern District of California

1    limitations on a court's exercise of personal jurisdiction over their claims." *Molock*, 952 F.3d at

2    298. This rule is not unique to class action but rather a "specific application of the more general

3    principle that personal jurisdiction entails a court's 'power over the parties before it.'" *Id.*

4    (quoting *Lightfoot v. Cendant Mortgage Corp.*, 137 S. Ct 553, 562 (2017)). By definition,

5    nonparties are not "parties before [a court]." *Id.* (quoting *Lightfoot*, 137 S. Ct. at 562)).

6           Two weeks after *Molock* was decided, the Fifth Circuit in *Cruson* similarly held that a

7    defendant's challenge to personal jurisdiction based on claims brought by putative class members

8    is not available before class certification. 954 F.3d at 250. In *Cruson*, the named plaintiffs, all

9    Texas residents, alleged the defendant engaged in wrongdoing related to annuity contracts entered

10   into by the parties. *Id.* at 245-46. The plaintiffs also sought to bring claims on behalf of a

11   nationwide class. *Id.* at 246. At the outset, the parties engaged in two rounds of pre-answer

12   motions to dismiss under Rules 12(b)(1) and 12(b)(6), but the defendant never raised personal

13   jurisdiction as a defense. *Id.* Instead, it waited until its answer to argue that the court lacked

14   personal jurisdiction over the non-Texas putative class members. *Id.* at 246-47. When the

15   plaintiffs finally moved to certify the class, the defendant again raised the issue of lack of personal

16   jurisdiction. *Id.* at 247.

17          Rejecting the plaintiff's argument that the defendant waived the personal jurisdiction

18   defense for failure to raise it in its pre-answer motions, the Fifth Circuit noted that the defendant's

19   challenge to personal jurisdiction concerned *putative* class members. *Id.* at 250. Those class

20   members "were not yet before the court" when the defendant filed its pre-answer motions. *Id.* It

21   is class certification, the court explained, that renders the putative class members "'subject to the

22   court's power.'" *Id.* (quoting *In re Checking Account Overdraft Litig.*, 780 F.3d 1031, 1037 (11th

23   Cir. 2015)). Because the nonresident plaintiffs were putative class members when the defendant

24   filed its motions to dismiss, the personal jurisdiction issue was simply not available. *Id.*

25          The Court finds the reasoning of *Molock* and *Cruson* persuasive. Here, the non-California

26   putative class members are not yet parties before the Court. At this juncture, the Court declines to

27   consider whether it *potentially* lacks personal jurisdiction over Defendant based on claims of

28   *potential* class members. To do so "would put the proverbial cart before the horse." *Chernus v.*

*Logitech, Inc.*, No.: 17-673(FLW), 2018 WL 1981481, at *8 (D.N.J. Apr. 27, 2018) (holding it premature to consider the defendant's motion to dismiss putative class members for lack of personal jurisdiction)). Because the putative class members are not yet parties in this case, the Court concludes Defendant did not waive the personal jurisdiction defense for failing to raise it in its prior motion to dismiss. *See also Gasser v. Kiss My Face, LLC*, No.17-cv-01675-JSC, 2018 WL 4538729, at *2 (N.D. Cal. Sep. 21, 2018) ("Given that it is premature to raise a personal jurisdiction issue as to putative class members, it is likewise premature to conclude that Defendant waived its ability to challenge the personal jurisdiction of the putative class members.")).

Accordingly, the Court DENIES Defendant's motion to dismiss the nonresident, putative class members claims for lack of personal jurisdiction at this stage of the litigation. [7] [8] Defendant may renew its argument at the class certification stage.

**D.      Failure to Plead Fraud with Particularity.**

Defendant renews its motion to dismiss all Plaintiffs' claims because they do not comply with the heightened pleading standard under Rule 9(b). Claims sounding in fraud or mistake, even when fraud is not a required element, are subject to heightened pleading requirements that require Plaintiffs to "state with particularity the circumstances regarding fraud or mistake." Fed. R. Civ. P. 9(b); *see Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). However, intent and knowledge may be alleged generally. Fed. R. Civ. P. 9(b). Accordingly, "[a]verments of fraud

---

[7]      The Court also does not believe that deferring its ruling on personal jurisdiction will result in burdensome class discovery. The Court has "broad discretion to control the class certification process, and '[w]hether or not discovery will be permitted . . . lies within the sound discretion of the trial court.'" *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 936, 942 (9th Cir. 2009) (quoting *Kamm v. California City Dev. Co.*, 509 F.2d 205, 209 (9th Cir. 1975)). Although the parties must likely engage in discovery related to class certification, "concerns about discovery costs must yield to Supreme Court precedent, which makes clear that putative class members are nonparties prior to class certification. *Molock*, 952 F.3d at 299 (citing *Smith*, 564 U.S. at 313)).

[8]      Regarding general jurisdiction, the parties provide conflicting evidence about the scope of Defendant's business operations in California during the class period. *See Delphix Corp. v. Embarcadero Techs., Inc.*, 749 F. App'x 502, 505-06 (9th Cir. 2018) ("[A] general jurisdiction inquiry should consider all of a defendant's contacts with the forum state prior to the filing of the lawsuit, rather than just those contacts that are related to the particular cause of action the plaintiff asserts.")). If Defendant renews this argument, the parties should be prepared to discuss more fully the scope of Defendant's business operations during the class period and how its relocation from California to Ohio impacts the general jurisdiction analysis.

1    must be accompanied by 'the who, what, when, where, and how' of the misconduct charged."

2    *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1107 (quoting *Cooper v. Pickett*, 137 F.3d 616,

3    627 (9th Cir. 1997)).  The particularity requirement is satisfied if a plaintiff "identifies the

4    circumstances constituting fraud so that a defendant can prepare an adequate answer from the

5    allegations."  *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989).

6         While many of Plaintiffs' claims do not require them to prove the traditional elements of

7    fraud, because many of the claims sound in fraud, Plaintiffs' allegations must meet Rule 9(b)'s

8    heightened pleading standard.  *See Kearns*, 567 F.3d at 1125.  Plaintiffs allege the *who* is

9    Defendant, Big Heart Pet Brands, Inc.  Plaintiffs allege *when* they began purchasing the products

10   and *when* they stopped.  (*See* SACC ¶¶ 80, 83, 86, 90, 93, 96, 99, 102, 105, 108, 111, 114, 117,

11   119.)  *What* is at issue is Defendant's representation that the Contaminated Dog Foods are "100

12   percent complete and balanced nutrition."  (SACC ¶ 60.)  Plaintiffs allege that statement was false,

13   misleading, and deceptive because Defendant affirmatively misrepresented or omitted that the

14   Contaminated Dog Foods were adulterated with pentobarbital, which explains *how* the

15   representation allegedly was false.  (*See id.* ¶¶ 56-64.)  All Plaintiffs identify the retailers *where*

16   they purchased the Contaminated Dog Foods on which the representation was made.  (*See, e.g., id.*

17   ¶¶ 80, 86.)  The Court concludes again that Plaintiffs' allegations satisfy Rule 9(b)'s heightened

18   pleading standard as they "identif[y] the circumstances constituting fraud so that [Defendant] can

19   prepare an adequate answer from the allegations."  *Moore*, 885 F.2d at 540.

20        Plaintiffs also attempt to pursue their claims based on representations on Defendant's

21   website and other advertisements.  (SACC ¶¶ 61, 64.)  The Court previously noted that to pursue

22   their claims based on these representations, Plaintiffs "must provide more detail about when they

23   are alleged to have seen those statements."  *In re Big Heart*, 2019 WL 8266869, at *10.  Plaintiffs

24   failed to cure these deficiencies.  Accordingly, the Court concludes Plaintiffs cannot proceed on

25   claims based on representations found on the website or on other advertisements.

26        For these reasons, the Court GRANTS, IN PART, AND DENIES, IN PART, Defendant's

27   motion to dismiss the SACC for failure to comply with Rule 9(b).  Defendant's remaining

28   arguments about knowledge, intent, reliance, and injury will be addressed in each respective

United States District Court
Northern District of California

21

1    claim.

2    **E.    Failure to State Claims for Relief.**

3         The Court now turns its attention to the sufficiency of Plaintiffs' claims.

4         **1.    Legal Standard.**

5         A motion to dismiss is proper under Rule 12(b)(6) where the pleadings fail to state a claim

6    upon which relief can be granted.  The Court's "inquiry is limited to the allegations in the

7    complaint, which are accepted as true and construed in the light most favorable to the plaintiff."

8    *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).  Even under the liberal pleading

9    standard of Rule 8(a)(2), Plaintiffs must provide more than mere labels, conclusions, and

10   formulaic recitations of their claims' requisite elements.  *Bell Atl. Corp. v. Twombly*, 550 U.S.

11   544, 555 (2007).  Plaintiffs must thus allege "enough facts to state a claim to relief that is plausible

12   on its face." *Id.* at 570.  "A claim has facial plausibility when the plaintiff pleads factual content

13   that allows the court to draw the reasonable inference that the defendant is liable for the

14   misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at

15   556)).  The Court need not "accept as true allegations that are merely conclusory, unwarranted

16   deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.,* 536 F.3d 1049,

17   1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.

18   2001)).

19        If the allegations are insufficient to state a claim, a court should grant leave to amend,

20   unless amendment would be futile.  *See, e.g., Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th

21   Cir. 1990); *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 246-47 (9th

22   Cir. 1990).

23        **2.    Consumer Protection Claims.**

24        Plaintiffs now raise 14 consumer protection claims under the laws of eight states.[9]

25   _____

26   [9]    Those consumer protections claims are the: California Legal Remedies Act ("CLRA");
     California False Advertising Law ("FAL"); California Unlawful Practices Act ("UCL"); Georgia
27   False Advertising Law ("GFAL"); Florida Deceptive and Unfair Trade Practices Act
     ("FDUTPA"); Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA");
28   Maryland Consumer Protection Act ("MCPA"); Washington Unfair Busines Practices and
     Consumer Protection Act ("WCPA"); Minnesota Commercial Feed Law ("MCFL"); Minnesota

     22

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Defendant moves to dismiss all claims for various reasons. Defendant argues that all consumer

2    protection statutes should be dismissed for failure to allege facts demonstrating statutory standing,

3    reliance or causation, an actionable misrepresentation, and an actionable omission. Defendant also

4    argues Plaintiffs' claims under the UCL, FDUTPA, ICFA, and WCPA fail because they do not

5    allege that its conduct was unfair, immoral, or unscrupulous. Defendant further argues that

6    Wahl's UCL claim fails to allege its conduct was unlawful. Defendant's final arguments make

7    unique challenges to Jilek's Minnesota claims.

8           The Court will address each argument, respectively.

9                  **a.      Statutory standing.**

10          Defendant renews its argument that Plaintiffs fail to allege statutory standing under the

11   CLRA (Claim 1), the FAL (Claim 2), and the UCL (Claim 3) because they did not demonstrate

12   they actually relied on four sets of representations: (1) the "100% Complete & Balanced

13   Nutrition" on the labels of the Contaminated Dog Foods; (2) any statements or omissions on

14   Defendant's website; (3) any statements or omissions on Walmart's website; and (4) any

15   statements made as part of a long-standing advertisement campaign.

16          The Court evaluates challenges to statutory standing under Rule 12(b)(6). *Maya*, 658 F.3d

17   at 1067 ("[L]ack of *statutory* standing requires dismissal for failure to state a claim[.]").

18          The CLRA, FAL, and UCL prohibit a seller from engaging in deceptive business practices.

19   *See* Cal. Bus. & Prof. Code §§ 17200, 17500; Cal Civ. Code § 1770. Any consumer who suffers

20   an economic injury "as a result of" prohibited conduct under these three statutes may bring an

21   action against the offending party. Cal. Bus. & Prof. Code §§ 17204, 17535; Cal. Civ. Code §

22   1780. Since the passage of Proposition 64, California state courts have interpreted the "as a

23   result" language to require a private plaintiff demonstrate actual reliance to have statutory standing

24   under California's consumer protection statutes. *See Kwikset Corp. v. Superior Court*, 51 Cal. 4th

25   310, 326 (2011); *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1366-67 (2010); *see also*

26

27   ─────────────────────

28   Unlawful Trade Practices Act ("MUTPA"); Minnesota False Statement in Advertising Act
     ("MFSAA"); Minnesota Prevention of Consumer Fraud Act ("MPCFA"); New York Deceptive
     Acts and Practices Act ("NYDAPA"); and New York False Advertising Act ("NYFAA").

Cal. Bus. & Prof. Code §§ 17204, 17535; Cal. Civ. Code § 1780(a).

To show actual reliance, Plaintiffs must demonstrate that the misrepresentation or omission was an "immediate cause of the injury-causing conduct." *In re Tobacco II Cases*, 46 Cal. 4th 298, 328 (2009). Plaintiffs need not prove the misrepresentation or omission was the "only," "sole," "predominant," or "decisive" cause of the injury causing conduct." *Id.* Rather, they may show that the misrepresentation or omission was a substantial factor in their decision-making process. *Id.* "[A] consumer who relies on a product label and challenges a misrepresentation contained therein can satisfy the standing requirement" by alleging "that he or she would not have bought the product but for the misrepresentation." *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1104 (9th Cir. 2013) (quoting *Kwikset*, 51 Cal. 4th at 330)). That assertion is enough to allege causation and an economic injury. *Kwikset*, 51 Cal. 4th at 330.

First at issue is the statement "100 Complete and Balanced Nutrition." In the October 4 Order, the Court noted that only four of the Contaminated Dog Foods at issue contained that statement on those labels. The Court concluded that Williamson, Collins, and Schirripa were the only Plaintiffs to allege they relied on that statement because they were the only Plaintiffs who alleged they had purchased a Contaminated Dog Food product with that representation on the label. *In re Big Heart*, 2019 WL 8266869, at *15.

Plaintiffs now allege that they "relied upon the '100 percent complete and balanced nutrition' claim when purchasing the Contaminated Dog Foods." (SACC ¶¶ 80, 83, 85, 90, 92, 96, 99, 102, 107, 113, 119.) While Plaintiffs parade these allegations under the guise of a factual allegation, it is conclusory in nature. Thus, the Court will not accept it as true. *Gilead*, 536 F.3d at 1055.

Plaintiffs also incorporate seven new images of partial labels containing the statement "100% Complete and Balanced Nutrition," but which do not appear on the full image of the corresponding Contaminated Dog Food. Defendant argues that because these partial images came from mockup labels and were subject to change, it is inappropriate to infer the statement appeared on the products Plaintiffs had purchased. While this point has merit, it is unavailing at this stage of the litigation. Plaintiffs do not allege the labels were mockups, and Defendant has not

24

1 presented material that the Court could consider on a motion to dismiss. *See Huntair, Inc. v.*

2 *Gladstone*, 774 F. Supp. 2d 1035, 1043 (N.D. Cal. 2011) ("Courts may also disregard factual

3 allegations that are controverted by any of the following: exhibits attached to the complaint,

4 matters subject to judicial notice, or documents necessarily relied on by the complaint and who

5 authenticity no party questions.")).

6 ███████████████████████████████████████████████████████████

7 ███████████████████████████████████████████████████████████████████

8 ██████████████████████████████████████ (SACC ¶¶ 122(a), (c), (e),

9 (g), (h), (k), (l), (m), (n), (o), (p), (q), (r).)  All Plaintiffs, except Mayo and Jilek, allege they

10 purchased at least one of those 13 products.  Although Plaintiffs do not provide much detail about

11 their individual encounters with the label, they collectively allege that they "*read* and relied upon

12 the labels of the Contaminated Dog Foods in making their purchasing decisions."  (*Id.* ¶ 129)

13 (emphasis added).  Plaintiffs allege they were injured because they purchased a product of "no or

14 *de minimus*" value, and because they conducted "business with a company [they] would not have"

15 had they known of the pentobarbital contamination.  (*Id.* ¶¶ 81, 84, 88, 91, 94, 97, 100, 103, 106,

16 109, 112, 115, 118, 120.)  Accepting these allegations as true and construing them in Plaintiffs'

17 favor, it plausible to infer that they had actually relied on the representation "100% Complete &

18 Balanced Nutrition" when they purchased the Contaminated Dog Foods.  *See Moore*, 966 F.3d at

19 1020-21 (holding actual reliance was sufficiently pled where the plaintiffs alleged they would not

20 have purchased the defendant's pet food had they known of the alleged misrepresentation)).

21 Accordingly, for these reasons, the Court DENIES, IN PART, Defendant's motion to

22 dismiss Claims 1 through 3 for failure to allege statutory standing as it relates to the representation

23 "100% Complete & Balanced Nutrition."

24 Next at issue are the representations on Defendant's website.  Plaintiffs allege that

25 Defendant guaranteed the safety and quality of the Contaminated Dog Foods on its website.  The

26 Court previously concluded Plaintiffs lacked statutory standing to pursue claims based on these

27 representations because "none of the Plaintiffs allege they visited or viewed the statements on

28 Defendant's website[.]"  *In re Big Heart*, 2019 WL 8266869, at *15.  Defendant renews its

25

argument that Plaintiffs still fail to allege actual reliance because they do not allege they visited its website and saw these statements. The Court agrees. Plaintiffs did not add any new allegations to support this assertion, and they did not respond to Defendant's argument in their opposition. Thus, Plaintiffs lack statutory standing to pursue their CLRA, FAL, and UCL claims based on any representations on Defendant's website, and the Court GRANTS, IN PART, Defendant's motion to dismiss Claims 1 through 3 as they relate to any representations on Defendant's website. The Court previously advised Plaintiffs that they needed to assert facts about when they allegedly saw these statements on Defendant's website. Because Plaintiffs failed to cure that deficiency, the Court DENIES Plaintiffs leave to amend.

Defendant also contends that Plaintiffs fail to allege reliance on any representations on Walmart's website. The Court previously concluded that Plaintiffs' allegation that the "100% Complete & Balanced Nutrition" statement appeared on Walmart's website was not enough to allege reliance because they did not allege they visited or purchased the Contaminated Dog Foods from the website. *In re Big Heart*, 2019 WL 8266869, at *15. Plaintiffs resolve this defect only as it relates to Schirripa. She alleges that she bought the Contaminated Dog Foods from Walmart.com and had relied on the statement "100% Complete & Balanced Nutrition" when she made her purchases. (SACC ¶ 119.) Schirripa further alleges she would not have purchased the products had she known the Contaminated Dog Foods contained pentobarbital. (*Id.* ¶ 120.) Construing these allegations in her favor, it is fair to infer she had relied on the representations made on Walmart.com when she purchased the Contaminated Dog Foods. The remaining Plaintiffs, however, do not allege they visited or purchased the Contaminated Dog Foods from Walmart's website.

For these reasons, the Court DENIES, IN PART, Defendant's motion to dismiss Claims 1 through 3 for failure to allege statutory standing as it relates to any representations on Walmart's website with regard to Schirripa, but GRANTS, IN PART, the motion with regard to the remaining Plaintiffs. Because the remaining Plaintiffs still do not allege facts that they visited or purchased the Contaminated Dog Foods from Walmart's website, the Court DENIES all other Plaintiffs leave to amend.

United States District Court
Northern District of California

1      Finally, the Court addresses whether Plaintiffs sufficiently allege they actually relied on

2   statements made as part of a long-standing advertising campaign.  Plaintiffs, however, provide no

3   new allegations to support that theory.

4      For these reasons, the Court GRANTS, IN PART, Defendant's motion to dismiss Claims 1

5   through 3 to the extent they are premised on a long-term advertising campaign.  Again, having

6   granted Plaintiffs leave to amend to allege facts with more specificity to show Defendant had a

7   long-standing advertising campaign and having failed to do so, the Court DENIES Plaintiffs leave

8   to amend.

9                  **b.      Misrepresentation theory.**

10      Plaintiffs assert the representation "100% Complete & Balanced Nutrition" is an

11   affirmative misrepresentation.  Defendant asserts that the consumer protections statutes, upon

12   which Plaintiffs rely, are designed to prevent deceptive practices.  Defendant thus argues that

13   Plaintiffs' consumer protections claims fail because the unintentional distribution of the

14   Contaminated Dog Foods does not amount to a deceptive practice.  Defendant only provides

15   authority relevant to the CLRA (Claim 1), FAL (Claim 2), UCL (Claim 3), FDUTPA (Claim 7),

16   ICFA (Claim 10), WCPA (Claim 21), NYDAPA (Claim 28), and NYFAA (Claim 29).

17   Accordingly, the Court limits its analysis to these claims.

18      The consumer protection statutes at issue generally prohibit a seller from engaging in

19   deceptive business practices, including the use of false or misleading representations while

20   involved in commerce.  Cal. Bus. & Prof. Code §§ 17200, 17500; Cal. Civ. Code §§ 1770; Fla.

21   Stat. §§ 501.202(2), 501.204(1); 815 Ill. Comp. Stat. § 505/2; N.Y. Gen. Bus. Law §§ 349(a), 350;

22   Wash. Rev. Code § 19.86.020.  A representation is deceptive if it actually deceives or has the

23   capacity to deceive a reasonable consumer.[10]  "'[W]hether a practice is deceptive will usually be a

24

25   [10]      *See Moore v. Mars. Petcare US, Inc.*, 966 F.3d 1007, 1017 (9th Cir. 2020) (explaining the
     reasonable consumer test governs whether a practice is deceptive under the CLRA, FAL, and
26   UCL—that is, whether "a significant portion of the general consuming public or of targeted
     consumers, acting reasonably in the circumstances, could be misled.") (internal quotation marks
27   omitted); *Muir v. Playtex Prods., LLC*, 983 F. Supp. 2d 980, 987 (N.D. Ill. 2013) ("Under the
     ICFA, 'a statement is deceptive if it creates a likelihood of deception or has the capacity to
28   deceive.") (quoting *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 938 (7th Cir. 2001); *Indoor
     Billboard/Washington, Inc. v. Integra Telecom of Washington, Inc.*, 170 P.3d 10, 18 (Wash. 2007)

United States District Court
Northern District of California

1    question of fact not appropriate for decision on demurrer' or motions to dismiss." *Moore*, 966

2    F.3d at 1017 (quoting *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008)).

3    ███████████████████████████████████████████████████████████████

4    ███████████████████████████████████████   (*See, e.g.,* SACC ¶ 122(a), (m), (r).)

5    According to Plaintiffs, they assumed the labels were accurate and believed the products were not

6    contaminated with pentobarbital.  (*See, e.g., id.* ¶¶ 81, 94.)   Plaintiffs allege that unknown to

7    them, the Contaminated Dog Foods contained pentobarbital.  (*Id.*)  From these allegations, it is

8    reasonable to infer Defendant's representation that the Contaminated Dog Foods were "100%

9    Complete and Balanced Nutrition" actually deceived and had the capacity to deceive Plaintiffs

10    into believing it was safe to feed to their pets, when in fact they were inherently unsafe, unhealthy,

11    and not part of a nutritious diet.

12         The Court finds unavailing Defendant's reliance on *Klein v. Earth Elements, Inc.*, 59 Cal.

13    App. 4th 965 (1997).  There, the defendant corporation sold pet food with the assurance: "You can

14    feed NATURE'S RECIPE . . . with confidence that you are doing something good for your dog."

15    *Id.* at 970.  Unknown to the defendant, a natural chemical reaction caused its products to produce a

16    toxin harmful to pets.  *Id.* at 967-68.  The plaintiff appealed the trial court's grant of summary

17    judgment for the defendant, arguing the public was likely to be deceived by the defendant's

18    assurance.  *Id.* at 970.  The Court of Appeal disagreed, explaining that although a reasonable

19    consumer would expect the product to be pet-edible, such a consumer would not be deceived when

20    it coincidentally happened to be contaminated.  *Id.*  That was especially true, the court explained,

21    because the defendant's acts were accidental and were not intended to deceive its consumers into

22    accepting its food as uncontaminated.  *Id.*

23    ───────────────────────

24    ("An unfair or deceptive act or practice need not be intended to deceive—it need only have the
     capacity to deceive a substantial portion of the public.") (quoting *Hangman Ridge Training*
25    *Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 535 (Wash. 1986); *Rollins, Inc. v. Butland*, 951
     So.2d 860, 869 (Fla. Dist. Ct. App. 2006) (Under the FDUTPA, "[a] deceptive practice is one that
26    is likely to mislead consumers.") (internal quotation marks omitted); *Andre Strishak & Assocs,*
     *P.C. v. Hewlett Packard Co.*, 752 N.Y.S.2d 400, 403 (N.Y. App. Div. 2002) (An act is deceptive
27    under the NYFAA if the advertisement is "likely to mislead a reasonable consumer acting
     reasonably under the circumstances.") (quoting *Oswego Laborers' Local 214 Pension Fund v.*
28    *Marine Midland Bank, N.A.*, 647 N.E.2d 741, 745 (N.Y. 1995)); *Stutman v. Chem. Bank*, 731
     N.E.2d 608, 611 (N.Y. 2000) (same for NYDAPA)).

United States District Court
Northern District of California

1    *Klein* is distinguishable in two respects.  First, unlike in *Klein* where the contamination

2    was unknown to the defendant, and as discussed more below in Section E.2.c.i, Plaintiffs

3    sufficiently allege Defendant knew or should have known that the Contaminated Dog Foods

4    contained pentobarbital. ████████████████████████████████████████

5    ████████████████████████████ (SACC ¶ 47), and deceived them by

6    selling them the Contaminated Dog Foods with the representation "100% Complete & Balanced

7    Nutrition," (*id.* ¶ 57-59.)  The situation here, as alleged, does not compare to the unknown and

8    accidental distribution of the contaminated pet foods in *Klein*.

9    Second, *Klein* is distinguishable because it was decided on summary judgment, whereas

10   this Court is faced with a motion to dismiss.  This difference in procedural posture is important

11   because the Court's inquiry is limited to the allegations in the pleadings, whereas in *Klein* the

12   court considered and weighed all the evidence.  Because the Court must accept the allegations as

13   true and construe them in Plaintiffs' favor, Plaintiffs sufficiently allege facts to show Defendant's

14   representations actually deceived or had the capacity to deceive a reasonable consumer.

15   While most of Plaintiffs' claims can withstand muster, Mayo's WCPA claim fails because

16   she does not allege the statement "100% Complete & Balanced Nutrition" appeared on the

17   products she purchased.  The Court cannot conclude that a reasonable consumer could be deceived

18   or is likely to be deceived by a misrepresentation that never appeared on Defendant's products.

19   Accordingly, the Court DENIES, IN PART, Defendant's motion to dismiss Claims 1, 2, 3,

20   7, 10, 28, and 29.  Moreover, because Mayo still does not allege that the representation "100%

21   Complete & Balanced Nutrition" appeared on the products she purchased, and she provides no

22   images to support an inference the statement appeared on the products, the Court GRANTS, IN

23   PART, Defendant's motion to dismiss Claim 21, and DENIES leave to amend.

24                          **c.      Omission theory.**

25   Plaintiffs also base their consumer protection claims on an omission theory.  Defendant

26   moves to dismiss all Plaintiffs' consumer protections claims for failure to allege an omission, but

27   it only provides authority for the CLRA (Claim 1), FAL (Claim 2), UCL (Claim 3), FDUTPA

28   (Claim 7), ICFA (Claim 10), MCPA, (Claim 18), WCPA (Claim 21), MPCFA (Claim 27),

                                          29

United States District Court
Northern District of California

1  NYDAPA (Claim 28), and NYFAA (Claim 29).  Accordingly, the Court limits its analysis to these

2  claims.

3       *i.*   **Claims 1, 2, and 3: CLRA, FAL, and UCL.**

4    Defendant first argues that Plaintiffs fail to allege that it knew or should have known of the

5  pentobarbital contamination to pursue their claims under the CLRA (Claim 1), FAL (Claim 2),

6  and UCL (Claim 3).

7    A plaintiff may base a UCL or CLRA claim "in terms constituting fraudulent omissions,

8  [but] to be actionable the omission must be contrary to a representation actually made by the

9  defendant, or an omission of a fact that the defendant was obliged to disclose."  *Daugherty v. Am.*

10  *Honda Motor Co.,* 144 Cal. App. 4th 824, 835 (2006); *see also Wilson v. Hewlett-Packard Co.*,

11  668 F.3d 1136, 1145 & n.5 (9th Cir. 2012).  "California courts have generally rejected a broad

12  obligation to disclose."  *Wilson*, 668 F.3d at 1141.  "California federal courts have generally

13  interpreted *Daugherty* as holding that a manufacturer's duty to consumers is limited to its

14  warranty obligations absent either an affirmative misrepresentation or a safety issue" that is known

15  to the manufacturer.  *Id.* (internal quotations and citations omitted).

16    The Court previously concluded that although it was a close case, Plaintiffs "plausibly

17  alleged facts from which it could infer that Defendant knew or should have known of the

18  pentobarbital contamination."  *In re Big Heart*, 2019 WL 8266869, at *20.  Plaintiffs' new

19  allegations further strengthen this inference. ███████████████████████████

20  ████████████████ (*See* SACC ¶¶ 17, 44-45.)  According to Plaintiffs, about two decades ago,

21  the FDA found residue of pentobarbital in many of Defendant's products, some of which are at

22  issue here.  (*Id.* ¶ 42.) ██████████████████████████████████████

23  █████████████ (*see id.* ¶ 17, 44), █████████████████████████████

24  ██████████████████████████████ (*id.* ¶ 44).  █████████████████████

25  ███████████████████████████████████████████████████████

26  ████████████████████████████████████████████

27  ██████████████████████████ (*Id.* ¶ 46.)  ██████████████████████████

28  ███████████████ (*id.* ¶ 47), and continued to use JBS as its product supplier even though JBS was

United States District Court
Northern District of California

1  publicly known for being plagued with quality and safety issues related to its products and for

2  knowingly working with meat by-products that likely contained pentobarbital, (*id.* ¶ 36-40).

3  Nonetheless, Defendant assured its consumers that it maintained rigorous quality and supplier

4  standards, such as using a comprehensive testing program to assess the safety and quality of its

5  ingredients though laboratory analyses and physical inspections. (*Id.* ¶ 41.) Defendant's pre-

6  release testing of ingredients that came from JBS later confirmed the presence of pentobarbital.

7  (*Id.* ¶¶ 22, 26.)

8  Based on those facts and because Rule 9(b) allows knowledge to be alleged generally, the

9  Court concludes Plaintiffs' allegations demonstrate that Defendant knew or should have known

10  that its products contained pentobarbital. *Cf. Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir.

11  1993) ("[T]he general rule that allegations of fraud based on information and belief do not satisfy

12  Rule 9(b) may be relaxed with respect to matters within the opposing party's knowledge. In such

13  situations, plaintiffs cannot be expected to have personal knowledge of the relevant facts.")).

14  Accordingly, the Court DENIES, IN PART, Defendant's motion to dismiss Claims 1, 2,

15  and 3 for failure to allege knowledge.

16  Plaintiffs also argue that the allegations supporting knowledge also support the conclusion

17  that Defendant "inten[ded] to deceive its consumers by not disclosing the true nature and quality

18  of the adulterated Contaminated Dog Foods." (Opp. at 14.) An affirmative misrepresentation of

19  fact operates as an active concealment of the true fact. *See Daugherty*, 144 Cal. App. 4th at 834

20  (finding no active concealment where the plaintiffs failed to allege the defendant car manufacturer

21  made a misrepresentation about its cars); *Outboard Marine Corp. v. Superior Court*, 52 Cal. App.

22  3d 30, 37-38 (1975) (finding the defendant actively concealed that its vehicle did not operate as

23  advertised)). Here, as discussed in Section E.2.c., Plaintiffs adequately allege that Defendant

24  knew or should have known of the pentobarbital contamination. Despite this knowledge,

25  Plaintiffs allege Defendant represented the Contaminated Dog Foods as "100% Complete &

26  Balanced Nutrition," when, in fact, they contained pentobarbital. (*See, e.g.,* SACC ¶¶ 80-81.)

27  Because Defendant allegedly misrepresented the Contaminated Dog Foods were "100% Complete

28  & Balanced Nutrition," it is fair to infer it also actively concealed the fact that the products were

contaminated with pentobarbital.

Accordingly, the Court DENIES, IN PART, Defendant's motion to dismiss Claims 1, 2, and 3 for failure to allege an omission.

### ii.    Claim 7: FDUTPA.

Defendant asserts an omission is actionable under the FDUTPA only if it had a duty to disclose.  Defendant argues no such duty arose to Sebastiano because he fails to adequately allege Defendant had knowledge of the pentobarbital contamination.

This Court's research has revealed no state court decision discussing whether a duty to disclose is required under the FDUTPA to pursue an omission.  *See also DeFrank v. Samsung Elecs Am., Inc.*, No. 19-21401 (KM) (JBC), 2020 WL 6269277, at *8 (D.N.J. Oct. 26, 2020) ("There is a surprising paucity of Florida state case law on the issue; the Court's research has disclosed no state court discussing [whether a duty to disclose is required].");  *Coffey v. WCW & Air, Inc.*, No. 3:17-cv-90,MCR-CJK, 2018 WL 4154256, at *4 (N.D. Fla. Aug. 30, 2018) ("It is not clear whether plaintiffs must establish an independent duty to disclose on a FDUTPA claim based on an omission affirmatively used to mislead.")).  Some district courts have interpreted a single Eleventh Circuit case, *Virgilio v. Ryland Group, Inc.*, 680 F.3d 1329 (11th Cir. 2012), for the proposition that a defendant must have a duty to disclose.  *See, e.g., Parziale v. HP, Inc.*, 445 F. Supp. 3d 435, 443-45 (N.D. Cal. 2020); *In re NJOY, Inc. Consumer Class Action Litig.*, No. CV 14-00428 MMM (JEMx), 2015 WL 12762461, at *14 (C.D. Cal. May 27, 2015).  By contrast, other district courts have held there is no duty to disclose requirement under the FDUTPA.  *See, e.g., DeFrank*, 2020 WL 6269277, at *10; *Gold v. Lumber Liquidators, Inc.*, No. 14-cv-05373-RS, 2019 WL 650426, at *4 (N.D. Cal. Jan. 2, 2019); *In re Takata Airbag Prods. Liab. Litig.*, No. 15-25990-MD-MORENO, 2016 WL 11662171, at *6 (S.D. Fla. 2016); *Morris v. ADT Sec. Servs.*, 580 F. Supp. 2d 1305, 1310 (S.D. Fla. 2008).

In *DeFrank*, the federal district court held a duty to disclose is not a requirement under the FDUTPA.  2020 WL 6269277, at *10.  In reaching its conclusion, the district court engaged in a comparative analysis of the explicit language of the FDUTPA, its legislative purpose, the Florida Supreme Court's interpretation of the FDUTPA, and the duty to disclose requirement under

common law fraud.  *Id.* at \*8-10.  The district court began by noting that the FDUTPA's text and its legislative purpose make clear that it is intended to be expansive.  *Id.* at \*8.  The Florida Supreme Court's discussion of the FDUTPA elements, the district court further explained, makes no reference to a duty to disclose.  *Id.* at \*9.  The district court found this particularly telling when compared to Florida's case law regarding common law fraud, which requires a plaintiff to show that a defendant has a duty to disclose when pursuing an omission theory.  *Id.* at \*9.  "The Florida Legislature that enacted FDUTPA, as well as the Florida Supreme Court which interpreted it, . . . must be presumed to have been familiar with the common law background, and to have departed from it advisedly."  *Id.* at \*9.  Based on the broad sweeping language of the statute, that no Florida state court imposed a duty to disclose requirement, and the inconsistency between the statute and the common law's duty to disclose requirement, the district court concluded no such requirement is required under the FDUTPA.  *Id.* at \*10.

The Court agrees with *DeFrank*: a plaintiff need not allege a defendant had a duty to disclose to pursue an omission theory under the FDUTPA.  As such, the Court respectfully disagrees with those federal courts that have held such a requirement exists.  In coming to those conclusions, those courts relied upon the Eleventh Circuit's opinion in *Virgilio*.  In *Virgilio*, the plaintiffs purchased their homes from one of the defendants.  680 F.3d at 1331.  Unknown to them, the property neighboring their houses had been "used as a bombing range during World War II and remain[ed] laden with unexploded bombs, ammunition, ordnance, and related chemicals."  *Id*.  When this information became public, their property values plummeted.  *Id.*  The plaintiffs claimed the defendants violated the FDUTPA by failing to inform them about the neighboring property.  *Id.* at 1332, 1137-38.  The Eleventh Circuit disagreed and held that the problem with the plaintiffs' argument was that "*whether or not a duty to disclose is an element of a FDUTPA claim*," the plaintiffs failed to allege facts showing the defendants were under a duty to disclose the issues about the neighboring property.  *Id.* at 1338 (emphasis added).

Most importantly here, the *Virgilio* court carefully qualified its holding with inconclusive language about "*whether or not a duty to disclose is an element of a FDUTPA claim*."  *Id.* at 1338.  That language indicates the Eleventh Circuit's unwillingness to narrowly hold that a plaintiff can

United States District Court
Northern District of California

United States District Court
Northern District of California

1  pursue an omission under the FDUTPA only when a defendant has a duty to disclose.

2      Accordingly, because Sebastiano need not allege a duty to disclose to pursue an omission

3  under the FDUTPA, the Court DENIES, IN PART, Defendant's motion to dismiss Claim 7.

4                          **iii.    Claim 10: ICFA.**

5      Defendant argues Sturm cannot pursue an omission under the ICFA because she fails to

6  adequately allege Defendant knew or should have known about the pentobarbital contamination.

7      "Under the ICFA, an 'omission' is an omission from a communication, rather than a

8  general failure to disclose." *Sherwin v. Samsung Elecs. Am., Inc.*, No. 16 C 7535, 2018 WL

9  11216896, at *3 (N.D. Ill. Mar. 2, 2018) (quoting *Darne v. Ford Motor Co.*, No. 13 CV 03594,

10  2017 WL 3836586, at *10 (N.D. Ill. Sep. 1, 2017)).  "An omission is 'material if the plaintiff

11  would have acted differently had [they] been aware of it, or if it concerned the type of information

12  upon which [they] would be expected to rely in making its decision to act." *Toulon v. Cont'l Cas.*

13  *Co.*, 877 F.3d 725, 740 (7th Cir. 2017) (quoting *DOD Techs. V. Mesirow Ins. Servs., Inc.*, 887

14  N.E.2d 1, 10 (Ill. App. Ct. 2008)).  Thus, to pursue an ICFA claim based on an omission, Sturm

15  must allege "(1) the materiality of the fact; (2) omission or concealment of the fact; and (3)

16  defendant's knowledge of the fact at the time of the sale." *Coss v. Playtex Prods.*, No. 08 C

17  50222, 2009 WL 2245657, at *2 (N.D. Ill. July 10, 2009).

18      For the reasons set forth in Section E.2.c.i, Sturm sufficiently alleges that Defendant knew

19  of the pentobarbital contamination and omitted this information when it had represented the

20  Contaminated Dog Foods as "100% Complete & Balanced Nutrition."  Accordingly, because the

21  allegations are enough to support a claim based on an omission under the ICFA, the Court

22  DENIES, IN PART, Defendant's motion to dismiss Claim 10 for failure to allege an omission.

23                          **iv.    Claim 18: MCPA.**

24      Defendant argues Collins cannot pursue an omission under the MCPA because she fails to

25  adequately allege Defendant knew or should have known about the pentobarbital contamination.

26      To prevail on an omission theory under section 13-301(9) of the MCPA, Collins must

27  allege and prove scienter, i.e., that the omission was made knowingly. *Luskin's Inc. v. Consumer*

28  *Prot. Div.*, 726 A.2d 702, 717 (Md. 1999).  "[O]missions are material 'if a significant number of

unsophisticated consumers would find that information important in determining a course of action.'" *Bank of Am., N.A. v. Jill P. Mitchell Living Tr.*, 822 F. Supp. 2d 505, 534 (D. Md. 2011) (quoting *Green v. H & R Block, Inc.*, 735 A.2d 1039, 1059 (Md. 1999)).  "Whether a significant number of unsophisticated consumers likely would have acted differently had the commercial entity provided the information in question is ordinarily a question of fact for the fact-finder." *Id.*

Here, Collins alleges Defendant knew of the pentobarbital contamination, and that he would not have purchased the products had he known of this issue.  Thus, Collins adequately alleges facts to support a claim based on an omission under the MCPA.  Accordingly, the Court DENIES, IN PART, Defendant's motion to dismiss Claim 18 for failure to allege an omission.

### v.        Claim 21: WCPA.

Defendant asserts an omission is actionable under the WCPA only if it had a duty to disclose.  Defendant argues that no such duty arose because Mayo did not allege that Defendant had knowledge of the pentobarbital contamination.

Mayo may pursue a WCPA claim under an omission theory if she can show that Defendant failed to disclose material facts.  *Polygon Nw. Co. LLC v. Louisiana-Pacific Corp.*, No. C11-620 MJP, 2012 WL 2504873, at *6 (W.D. Wash. June 28, 2012).  A duty to disclose arises "when the facts are known to the seller but not easily discoverable by the buyer."  *Id.*

For the reasons set forth in Section E.2.c.i, Mayo adequately alleges Defendant knew of the pentobarbital contamination.  At this stage, it is fair to infer this fact was material, that it was not disclosed on the packaging of the Contaminated Dog Foods, and that it was not easily discoverable by Mayo.  For these reasons, the Court DENIES, IN PART, Defendant's motion to dismiss Claim 21 for failure to allege an omission.

### vi.        Claim 27: MPCFA.

Like its argument under the WCPA, Defendant contends that Jilek fails to allege an omission under the MPCFA because it had no duty to disclose.

An omission is actionable under the MPCFA if it is material and the defendant was under a duty to disclose the material fact to the other party.  *Graphic Commc'ns Local 1B Health & Welfare Fund A v. CVS Caremark Corp.*, 850 N.W.2d 682, 695 (Minn. 2014).  A duty to disclose

35

arises under three circumstances: first, when there is "a confidential or fiduciary relationship with the other party"; second, when the defendant has "special knowledge of material facts to which the other party does not have access"; and third, when a defendant is speaking, "they must say enough to prevent the words communicated from misleading the other party." *Id.* Defendant challenges only the second circumstance.

For the reasons set forth in Section E.2.c.i, Jilek sufficiently alleges that Defendant knew or should have known about the pentobarbital contamination to support an omission theory under the MPCFA. For these reasons, the Court DENIES, IN PART, Defendant's motion to dismiss Claim 27 for failure to allege an omission.

### vii.    Claims 28 and 29: NYDAPA and NYFAA.

Under the NYDAPA and NYFAA, an omission is actionable "'where [the] business alone possesses material information that is relevant to the consumer and fails to provide this information." *Lebowitz v. Dow Jones and Co.*, 508 F. App'x. 83, 85 (2d Cir. 2013) (quoting *Oswego*, 647 N.E.2d at 745)).

Here, Schirripa alleges Defendant possessed information about the risks of pentobarbital contamination because it knew or should have known about the problems with the Contaminated Dog Foods. According to Schirripa, this information is material because had she known this information, she would not have purchased the Contaminated Dog Foods. (SACC ¶ 120.) Defendant, however, allegedly failed to disclose this information. (*See id.* ¶ 119-20.) When construed in Schirripa's favor, these allegations support an omission under the NYDAPA and NYFAA. *See also Dixon v. Ford Motor, Co.*, No. 14-CV-6135 (JMA)(ARL), 2015 WL 6437612, at *8-9 (E.D.N.Y. Sep. 30, 2015) (holding omission was actionable where defendant had knowledge of a defect with the car's exhaust and failed to disclose such information to the plaintiff)).

Accordingly, the Court DENIES, IN PART, Defendant's motion to dismiss Claims 28 and 29 for failure to allege an omission.

### d.    Unfair, immoral, and unscrupulous conduct.

Plaintiffs also pursue a separate theory under the UCL (Claim 3), FDUTPA (Claim 7),

United States District Court
Northern District of California

1    ICFA (Claim 10), and WCPA (Claim 21) and allege that Defendant's conduct was unfair,

2    immoral, and unscrupulous.  Defendant argues this prong of these statutes is intended to prevent

3    deceptive business practices.  It asserts Plaintiffs could not have been deceived by the

4    unintentional distribution of the Contaminated Dog Foods with pentobarbital, and thus, its conduct

5    is not unfair, immoral, and unscrupulous.

6        In California, the state courts are split on how to determine whether a business practice is

7    unfair under the UCL.  *Drum v. San Fernando Valley Bar Ass'n.*, 182 Cal. App. 4th 247, 256

8    (2010).  Three different tests have been applied: The first test requires "that the public policy

9    which is a predicate to a consumer unfair competition action under the 'unfair' prong of the UCL

10   must be tethered to specific constitutional, statutory, or regulatory provisions." *Id.* (quoting

11   *Bardin v. DaimlerChrysler Corp.*, 136 Cal. App. 4th 1255, 1260-61 (2006)).  The second test

12   looks at "whether the alleged business practice 'is immoral, unethical, oppressive, unscrupulous or

13   substantially injurious to consumers and requires the court to weigh the utility of the defendant's

14   conduct against the gravity of the harm to the alleged victim.'" *Id.* (quoting *Bardin*, 136 Cal. App.

15   4th at 1260)).  The third test is guided by section 5 of the Federal Trade Commission Act's

16   definition of unfair and requires that "(1) the consumer injury must be substantial; (2) the injury

17   must not be outweighed by any countervailing benefits to consumers or competition; and (3) it

18   must be an injury that consumers themselves could not reasonably have avoided." *Id.* (quoting

19   *Davis v. Ford Motor Credit Co.*, 179 Cal. App. 4th 581, 597-98 (2009)).

20       Under the FDUTPA, ICFA, and WCPA, courts consider three factors to determine whether

21   a practice is unfair: first, whether the practice offends establish public policy; second, whether it is

22   immoral, unethical, oppressive, or unscrupulous; and third, whether it causes substantial injury to

23   consumers.  *Rollins*, 951 So.2d at 869; *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951,

24   961 (Ill. 2002); *Rush v. Blackburn*, 361 P.3d 217, 224-25 (Wash. Ct. App. 2015).

25       Defendant fails to carry its burden to explain why its conduct is not unfair under any of the

26   UCL's tests or under the three factors for the FDUTPA, ICFA, and WCPA claims.  Instead,

27   Defendant relies on *Klein* and argues that its conduct was not deceptive because it unintentionally

28   sold the Contaminated Dog Foods with pentobarbital. But as discussed above in Section E.2.b, the

United States District Court
Northern District of California

1    Court finds Defendant's reliance on *Klein* unpersuasive.  Thus, the Court cannot conclude that

2    Plaintiffs cannot pursue a claim under this prong.

3        Accordingly, the Court DENIES, IN PART, Defendant's motion to dismiss Claims 3, 7,

4    10, and 21 for failure to allege that its conduct was unfair, immoral, or unscrupulous.

5                    **e.      Unlawful conduct.**

6        Plaintiffs also pursue their UCL claim (Claim 3) under a theory that Defendant's conduct

7    was unlawful.  Defendant argues Plaintiffs do not allege that its conduct violates any law or

8    statute.  Because the UCL "borrows standards of conduct from other statutes," Plaintiffs "need

9    only show the violation of any law." *Id.*  Thus, any law—federal, state, or local—can support

10   theory of unlawfulness.  *Friedman v. AARP, Inc.*, 855 F.3d 1047, 1052 (9th Cir. 2017).

11       As the Court discussed in Sections E.2.a, E.2.b, and E.2.c.i, Plaintiffs allege sufficient facts

12   to pursue their CLRA and FAL claims.  Those violations alone can serve as a predicate for the

13   unlawful prong of the UCL.  *See Gutierrez v. Carmax Auto Superstores California*, 19 Cal. App.

14   5th 1234, 1265 (2018) (finding the CLRA can serve as a predicate for a UCL cause of action);

15   *Brockey*, 131 Cal. Rptr. 2d at 755 ("A violation of the false advertising law is a violation of the

16   UCL.").  Therefore, the Court concludes that Plaintiffs adequately allege facts to assert that

17   Defendant's conduct was unlawful under the UCL.[11]

18       Accordingly, the Court DENIES, IN PART, Defendant's motion to dismiss Claim 3 for

19   failure to allege its conduct was unlawful.

20                   **f.      Minnesota claims.**

21       Jilek alleges Defendant violated the MCFL (Claim 24), MUTPA (Claim 25), MFSAA

22   (Claim 26), and MPCFA (Claim 27).

23       Defendant moves to dismiss these claims for two reasons.  First, Defendant renews its

24

25   [11]     In a footnote, Defendant essentially argues the CLRA and FAL cannot serve as a predicate
26   for the unlawful prong of the UCL.  That is wrong.  Courts have repeatedly held that violations of
     the CLRA and FAL can serve as a bases under the UCL's unlawful prong. *See, e.g., Roper*, 2020
27   WL 7769819, at *13 (E.D. Cal. Dec. 30, 2020); *Sperling v. Stein Mart, Inc.*, 291 F. Supp. 3d 1076,
     1083 (C.D. Cal. 2018); *Brockey*, 107 Cal. App. 4th at 98.  Because Plaintiffs adequately allege
28   claims under the CLRA and FAL, they likewise adequately allege a violation of the UCL's
     unlawful prong.

                                            38

United States District Court
Northern District of California

argument that Jilek lacks authority under the Minnesota's Private Attorney General Statute to pursue their MCFL claim.  Second, Defendant argues that these claims fail for failure to allege the lawsuit provides a public benefit.

### i.     Claim 24: MCFL and the Private Attorney General Statute.

Among other acts, the MCFL prohibits manufacturing, distribution, adulteration, and misbranding of commercial feed.  Minn. Stat. § 25.38.  Commercial feed is defined as any "materials or combinations of materials that are distributed or intended to be distributed for use as feed or for mixing in feed[.]"  *Id.* § 25.33(5).  The MCFL "was enacted to protect farmers from harmful animal feeds[.]"  *Duxbury v. Spex Feeds, Inc.*, 681 N.W.2d 380, 389 (Minn. Ct. App. 2004).  Jilek pursues this claim under Minnesota's Private Attorney General Statute.  *See* Minn. Stat. § 8.31(3a).  That statute authorizes the attorney general and any person to investigate and sue for "unfair, discriminatory, and other unlawful practices in business, commerce, or trade[.]"  *Id.* § 8.31(1), (3a).  Subdivision 1 lists examples of laws covered under the Private Attorney General statute, and it expressly states it is non-exclusive.  *See id.* § 8.31(1).

The Court previously concluded Jilek can pursue her claim under the Private Attorney General Statute.  *In re Big Heart*, 2019 WL 8266869, at *21.  Defendant renews its argument that she cannot, contending that Jilek's MCFL claim goes beyond the authority of the attorney general because the MCFL can only be administered by the Commissioner of the Minnesota Department of Agriculture.

The commissioner oversees the Minnesota Department of Agriculture.  Minn. Stat. § 17.01.  As part of its duties, "the commissioner shall administer sections 25.31 to 25.43," including the MCFL.  *Id.* § 25.32.  Although true that the commissioner must administer the MCFL, the statute does not expressly limit the enforcement of the statute to the commissioner.  Tellingly, Defendant cites no cases, statutes, or legislative history expressly limiting enforcement of the MCFL to just the commissioner.  Nor did this Court's research reveal anything to support Defendant's argument.  The Court thus concludes Defendant fails to carry its burden to show that Jilek cannot sue under the Private Attorney General statute for her MCFL claim.

United States District Court
Northern District of California

1    Accordingly, the Court DENIES, IN PART, Defendant's motion to dismiss Claim 24.

2        **ii.    Claims 24 through 27: Public benefit.**

3        Defendant argues Jilek's claims do not benefit the public interest because she lacks

4    standing to seek injunctive relief, and because Defendant made a standing offer to compensate her.

5        To pursue her claims under the Private Attorney General Statute, Jilek must demonstrate

6    the lawsuit benefits the public.  *Ly v. Nystrom*, 615 N.W.2d 302, 314 (Minn. 2000).  In

7    determining whether a lawsuit benefits the public, the Court must consider several factors: the

8    form of the  alleged misrepresentation, the degree of the misrepresentation, the relief sought, and

9    whether the misrepresentations are ongoing.  *Khoday v. Symantec Corp.*, 858 F. Supp. 2d 1004,

10   1017 (D. Minn. 2012).

11       Here, Jilek alleges Defendant marketed and sold its products nationally with the false and

12   misleading representation "100% Complete & Balanced Nutrition."  *See also id.* at 1017 (finding

13   public benefit requirement satisfied where the defendant widely advertised and sold its product);

14   *Collins v. Minnesota Sch. of Bus., Inc.*, 655 N.W.2d 320, 330 (Minn. 2003) (finding public benefit

15   requirement satisfied where the defendant made misrepresentations to the general public through

16   television advertisements, sale, and presentations)).  Jilek alleges she was harmed by Defendant's

17   conduct and seeks damages for herself and the absent class members.  She also seeks an injunction

18   requiring Defendant to test for pentobarbital and disclose on the Contaminated Dog Foods that its

19   products are not adulterated with pentobarbital.  The Court can thus infer that the damages and

20   injunctive relief would provide relief to past consumers and assist future consumers in making

21   informed decisions about whether they should purchase Defendant's products.

22       Defendant also argues that Jilek's claims do not benefit the public because she lacks

23   standing to seek injunctive relief, and that Defendant has made a standing offer to compensate her.

24   As discussed in Section A.2, Plaintiffs adequately allege standing to seek injunctive relief.

25   Moreover, while there is a standing offer, Jilek does not request solely monetary compensation.

26   She also seeks an injunction requiring Defendant to disclose whether it adequately tested for

27   pentobarbital and that its products are unadulterated.  An injunction would thus benefit the public

28   in ways that monetary compensation would not.

40

United States District Court
Northern District of California

1    Accordingly, the Court DENIES, IN PART, Defendant's motion to dismiss Claims 24, 25,

2    26, and 27 for failure to allege a public benefit.

3            **g.    Reliance and causation.**

4    Defendant also moves to dismiss several of Plaintiffs' consumer protection claims for

5    failure to allege reliance and causation.[12]  The Court notes, however, it is unclear from

6    Defendant's briefing which claims it moves to dismiss.  On page 21 of its motion, Defendant

7    moves to dismiss Claims 1-3, 6-7, 10, 21, and 24-27.  Yet, Defendant fails to provide any

8    authority relevant to Claims 6, 7, 10, or 21, nor does it discuss those claims.  However, it does

9    provide authority for Claims 18 and 19.  Plaintiffs highlighted this oversight in their opposition.

10   Defendant again ignored these issues in its reply.  Defendant's inconsistent and unclear briefing

11   does not aid the Court.  Accordingly, the Court will address only those consumer protection claims

12   for which Defendant has provided legal authority: CLRA (Claim 1), FAL (Claim 2), UCL (Claim

13   3), MCPA (Claim 18), MCFL (Claim 24), MUTPA (Claim 25), MFSAA (Claim 26), and MPCFA

14   (Claim 27).

15           **i.    Claims 1, 2, and 3: CLRA, FAL, and UCL.**

16   To maintain their claims under the CLRA, FAL, and UCL, Plaintiffs must allege they

17   actually relied on Defendant's representations.  For the reasons discussed in Section E.2.a, all

18   Plaintiffs, except Mayo and Jilek, adequately allege facts from which it can be reasonably inferred

19   they actually relied on the statement "100% Complete & Balanced Nutrition" when they

20   purchased the Contaminated Dog Foods.

21   Accordingly, the Court GRANTS, IN PART, AND DENIES, IN PART, Defendant's

22   motion to dismiss Claims 1, 2, and 3 for failure to allege actual reliance.

23           **ii.    Claim 18: MCPA.**

24   To prevail on a MCPA claim, Collins must show he reasonably relied upon Defendant's

25   unfair or deceptive practice or misrepresentation and that the practice or misrepresentation caused

26   him actual injury.  *Peete-Bey v. Educ. Credit Mgmt. Corp.*, 131 F. Supp. 3d 422, 432 (D. Md.

27   

28   
___
[12]    Defendant raises the same argument as to Plaintiffs' fraud claims. Those claims are discussed in a later section.  *See* discussion *infra* Section E.4.a.

United States District Court
Northern District of California

1    2015).  "A consumer relies on a misrepresentation when the misrepresentation substantially

2    induces the consumer's choice." *Jill P.*, 822 F. Supp. 2d at 533.  Put another way, a consumer

3    relies on a misrepresentation "where it is substantially likely that the consumer would not have

4    made the choice in question had the commercial entity disclosed" the proper information.  *Id.* at

5    535.

6            The Court previously denied Defendant's motion because it failed to carry its burden to

7    show reliance was required to prove the MCPA.  *In re Big Heart*, 2019 WL 8266869, at *17.

8    Defendant now adequately briefs this issue this time around.  Nevertheless, the Court finds

9    Defendant's arguments unpersuasive.  Collins alleges he purchased the Contaminated Dog Foods

10   with the representation "100% Complete & Balanced Nutrition," and assumed it was accurate and

11   that the products were unadulterated.  (SACC ¶¶ 113-14.)  Construing these allegations in

12   Collins's favor, it is fair to infer that Defendant's representation substantially induced his choice to

13   purchase the Contaminated Dog Foods.

14           Accordingly, the Court DENIES, IN PART, Defendant's motion to dismiss Claim 18.

15                   **iii.    Claims 24 through 27: MCFL, MUTPA, MFSAA, MPCFA.**

16           Generally, a plaintiff need not allege individual reliance to prevail on their consumer

17   protections claims under the MUTPA, MFSAA, and MPCFA.  *See Grp. Health Plan, Inc. v.*

18   *Philip Morris Inc.*, 621 N.W.2d 2, 13 (Minn. 2001) ("[W]e conclude that it is not necessary to

19   plead individual consumer reliance on the defendant's wrongful conduct to state a claim for

20   damages under [the Private Attorney General Statute] and the substantive misrepresentation in

21   sales statutes.")).  However, when a plaintiff's harm is caused by deceptive, misleading, or

22   fraudulent statements, she must allege that she relied on those statements to recover under

23   Minnesota's consumer fraud statutes.  *Id.* at 13-14; *see Thompson v. Am. Tobacco Co.*, 189 F.R.D.

24   544, 552-53 (D. Minn. 1999) (noting that "the legislature fashioned a consumer fraud regime that

25   does not always require individual proof of reliance" and finding reliance required when plaintiff

26   seeks damages)).

27           Here, Jilek fails to adequately allege she relied on the representation "100% Complete &

28   Balanced Nutrition." Jilek alleges she purchased the Gravy Train with Beef Chunks, Gravy Train

42

with Chicken Chunks, and Gravy Train Meaty Ground Dinner with Beef and Bacon flavors.  (*Id.* ¶ 116.)  However, she neither alleges that the representation appeared on the products she purchased, nor does it appear on any of the corresponding images of the Contaminated Dog Foods.  Without more, the Court cannot plausibly infer that she actually relied on Defendant's representation.

For those reasons, the Court GRANTS, IN PART, Defendant's motion to dismiss Claims 25, 26, and 27.  Because Jilek still fails to allege she purchased a product with this statement on it, the Court DENIES Jilek leave to amend these claims.

As for Jilek's MCFL claim, it is not clear whether Jilek needs to allege reliance to maintain this claim.  The case Defendant relies upon only discusses reliance as an element in the context of Minnesota's consumer protection statutes—the MUTPA, MFSAA, and MPCFA.  (*See* Mot. at 22, (citing *Buetow v. A.L.S. Enters., Inc.*, 259 F.R.D. 187, 191 (D. Minn. 2009)).  This Court's research has revealed no Minnesota state court opinion requiring a plaintiff to allege reliance to maintain a claim under the MCFL.  Accordingly, the Court concludes Defendant has failed to meet its burden to show reliance is an element of an MCFL claim, and it DENIES, IN PART, Defendant's motion to dismiss Claim 24.

### 3.    Express Warranty Claims.

Plaintiffs raise seven claims for breach of an express warranty under the laws of California (Claim 4), Florida (Claim 8), Ohio (Claim 11), Tennessee (Claim 13), Texas (Claim 16), Maryland (Claim 20), and Washington (Claim 23).  As a preliminary matter, the parties agree that Sebastiano (Florida) and Brown (Texas) fail to allege the requisite notice for their express warranty claims.  Accordingly, the Court GRANTS Defendant's motion to dismiss Claims 8 and 16 on that basis.

Defendant moves to dismiss the remaining five breach of express warranty claims for failure to allege that the representation "100% Complete & Balanced Nutrition" became part of the basis of Plaintiff's bargain and for failure to allege damages.

### a.    Basis of their bargain.

A seller can create an express warranty through any affirmation of fact or promise, any

United States District Court
Northern District of California

1    description, or sample or model related to its goods and when the representations form the basis of

2    the buyer's bargain.  Cal. Com. Code § 2313(1)(a)-(c); Md. Code Ann., Com. Law § 2-313; Ohio

3    Rev. Code § 1302.26(A); Tenn. Code. Ann. § 47-2-313(1)(a)-(c); Wash. Rev. Code § 62A.2-

4    313(1)(a)-(c).

5            The Court previously concluded Williamson (Ohio) and Collins (Maryland), who were the

6    only Plaintiffs to allege they purchased Contaminated Dog Foods with the statement "100%

7    Complete & Balanced Nutrition," could pursue their claims because they were the only Plaintiffs

8    to sufficiently allege that the representation became part of the basis of their bargain with

9    Defendant.  *In re Big Heart*, 2019 WL 8266869, at *26.  Because their allegations remain the

10   same, the Court concludes again that they allege sufficient facts to show that Defendant's

11   representation became part of the basis of their bargain.

12           Plaintiffs also have cured the deficiencies related to their California and Tennessee claims.

13   To begin, Plaintiffs substituted Wahl for Johnson as their named California Plaintiff.  (SACC ¶

14   92.)  Plaintiffs also added new partial images containing the statement "100% Complete &

15   Balanced Nutrition" on at least one of the products purchased by Wahl or Christian.  (*Id.* ¶¶

16   122(a), (e).)  After reading this label, Wahl and Christian purchased the products, assuming the

17   label was true and accurate, and that the products were not contaminated with pentobarbital.  (*Id.*

18   ¶¶ 94, 103.)  Accepting these allegations as true and construing them in their favor, it is plausible

19   to infer that the statement became part of the basis of their bargains with Defendant.

20           Defendant's main contention as to Wahl and Christian's claims is that the newly added

21   images are unhelpful because Plaintiffs do not allege this banner was actually on the product.

22   Again, while Defendant's point is valid, these images are enough for the Court to plausibly infer

23   the representation "100% Complete & Balanced Nutrition" appeared on the products.  Defendant's

24   contention would be better raised at the summary judgment stage or at trial.

25           Mayo's Washington claim does not fare as well.  Mayo's sole effort to cure these

26   deficiencies is to add the allegation that she "relied upon the '100 percent complete and balanced

27   nutrition' claim when purchasing the Contaminated Dog Foods."  (SACC ¶ 111.)  As previously

28   noted, this is a conclusory allegation parading as a factual allegation.  Moreover, unlike Wahl and

United States District Court
Northern District of California

44

1    Christian, she neither alleges the representation "100% Complete & Balanced Nutrition" appeared

2    on the products she purchased, nor has she incorporated a separate image of a partial label

3    containing that representation.  Without more, the Court cannot conclude that Defendant's

4    representation became part of the basis of her bargain with Defendant.

5         Accordingly, the Court DENIES, IN PART, Defendant's motion to dismiss Claims 4, 11,

6    13, and 20, and GRANTS, IN PART, Defendant's motion to dismiss Claim 23 for failure to allege

7    that the representation "100% Complete & Balanced Nutrition" was part of the basis of the

8    Plaintiffs' bargain with Defendant.

9              **b.    Damages.**

10        Defendant also argues that Plaintiffs express warranty claims fail for failure to allege

11   damages as there is a standing offer to compensate the affected consumers.  Essentially, Defendant

12   argues these claims are moot.  The Court previously rejected this argument because "Plaintiffs do

13   not allege they accepted a refund as part of Defendant's recall and refund program."  *In re Big*

14   *Heart*, 2019 WL 8266869, at *30 n.18.  Defendant's argument still suffers from the same flawed

15   reasoning.

16        Accordingly, the Court DENIES, IN PART, Defendant's motion to dismiss Claims 4, 11,

17   13, 20, and 23 for failure to allege damages.

18            **4.    Implied Warranty Claims.**

19        Plaintiffs brings four claims for breach of an implied warranty under the laws of Florida

20   (Claim 9), Ohio (Claim 12), West Virginia (Claim 15), and Texas (Claim 17).  As an initial

21   matter, the parties agree that Brown (Texas) did not allege the requisite notice to assert her claim.

22   Accordingly, the Court GRANTS Defendant's motion to dismiss Claim 17 on that basis.

23        Defendant first moves to dismiss the remaining three breach of implied warranty claims on

24   the basis that they fail for the same reasons the express warranty claims fail.

25        As explained above, because Williamson alleges sufficient facts to pursue his express

26   warranty claim under Ohio law, the Court concludes he likewise alleges enough facts to sustain

27   his implied warranty claim.  With regard to Sebastiano (Florida) and Thomas (West Virginia), the

28   Court previously concluded that their implied warranty claims failed because they did not show

United States District Court
Northern District of California

45

United States District Court
Northern District of California

that the statement "100% Complete & Balanced Nutrition" became part of the basis of their bargain. *In re Big Heart*, 2019 WL 8266869, at *27. Both Plaintiffs now add partial images containing the representation "100% Complete & Balanced Nutrition," which they allege they relied on in making their purchases. (SACC ¶¶ 85, 104.) It is thus fair to infer that the representation "100% Complete & Balanced Nutrition" became part of the basis of their bargains with Defendant.

For these reasons, the Court DENIES, IN PART, Defendant's motion to dismiss Claims 9, 12, and 15.

Defendant also moves to dismiss Sebastiano's (Florida) and Williamson's (Ohio) implied warranty claims because they lack privity with Defendant, and no exception applies. Under Florida and Ohio law, parties to a contract must be in privity to prevail on a breach of implied warranty claim. *Toca v. Tutco, LLC*, 430 F. Supp. 3d 1313, 1325 (S.D. Fla. 2020); *Curl v. Volkswagen of Am., Inc.*, 871 N.E.2d 1141, 1147 (Ohio 2007). The parties do not dispute that traditional privity does not exist between Plaintiffs and Defendant. Rather, their main dispute is whether any exceptions save the implied warranty claims.

To begin, Defendant asks the Court to reconsider its previous conclusion that it was "not willing to conclude as a matter of law that [Plaintiffs] cannot rely on the foodstuffs exception to the privity requirement." *In re Big Heart*, 2019 WL 8266869, at *29. Defendant only raises this issue as to Sebastiano's implied warranty claim under Florida law. Defendant argues the law is clear that the exception is narrowly construed to apply to products intended for human consumption. The only case it cites interpreting Florida state law is *Wilson v. Chattem, Inc.*, CASE NO. 09-80681-CIV-DIMITROULEAS, 2009 WL 10667848, at *1 (S.D. Fla. Dec. 17, 2009). There, the defendant moved to dismiss the plaintiffs' breach of implied warranty claim for lack of privity, arising from allegations that the defendant mislabeled and improperly advertised its dietary supplement. *Id.* at 4. The plaintiffs did not challenge the lack of privity, but instead invoked the foodstuffs exception. *Id.* Relevant here is that the defendant provided no argument or authority explaining why that case should not fall within the foodstuffs exception. *Id.* at 5. The district court held that, at the motion to dismiss stage, it could not conclude the plaintiffs' breach

46

United States District Court
Northern District of California

1   of implied warranty claim was barred for lack of privity because the defendant "presented no

2   grounds to distinguish the present facts from the recognized foodstuff exception." *Id.*

3         The Court finds Defendant's reliance on *Wilson* unpersuasive.  First, the *Wilson* court was

4   addressing whether the foodstuffs exception applied to products for human consumption, not

5   animal consumption.  The Court is also unaware aware of any Florida cases discussing the

6   foodstuffs exception in the context of animal consumption.  Second, while Defendant is correct

7   that the *Wilson* court could not conclude that the foodstuffs exception applied to dietary

8   supplements, its hesitancy cannot be construed as an attempt to limit the foodstuffs exception to

9   only cases involving human consumption.  At this stage, the Court is still not willing to conclude

10  as a matter of law that Plaintiffs cannot rely on the foodstuffs exception to the privity requirement.

11        Williamson invokes two exceptions to the privity requirement under Ohio law.  The first is

12  the agency exception.  Under this exception, privity may exist between Williamson and Defendant

13  if the latter "is so involved in the sales transaction that the distributor merely becomes the

14  manufacturer's agent[.]"  *Norcold, Inc. v. Gateway Supply Co.*, 798 N.E.2d 618, 628 (Ohio Ct.

15  App. 2003).  That standard is satisfied when a manufacturer plays an extensive and active role in

16  the underlying sales transaction with the consumer.  *See Mettler-Toledo, Inc. v. Wysong & Miles*

17  *Co.*, No. 98AP-1462, 1999 WL 1009721, at \*3-4 (Ohio Ct. App. 1999); *see also Miles v.*

18  *Raymond Corp.*, 612. F. Supp. 2d 913, 925-26 (N.D. Ohio 2009) (finding agency relationship

19  existed where the plaintiffs alleged the defendant manufacturer was involved with the underlying

20  sale of the forklift to plaintiffs); *Nationwide Ins. Co. v. Case Corp.*, No. 5-02-43, 2002 WL

21  31500585, at \*7 (Ohio Ct. App. 2002) (finding no privity where manufacturer was not involved in

22  the underlying sale of a tractor to plaintiff's subrogee)).

23        In *Mettler-Toledo*, for example, the plaintiff contacted the defendant manufacturer about

24  purchasing one of the latter's machines.  *Id.* at \*4.  The manufacturer then contacted its local

25  distributor, who in turn contacted the plaintiff.  *Id.*  Representatives from both the manufacturer

26  and distributor visited the plaintiff's facility, and employees of the plaintiff visited the

27  manufacturer's factory to observe how the machine operated.  *Id.*  The distributor provided the

28  plaintiff with a quote for the price of the machine, which was generated by the manufacturer.  *Id.*

The manufacturer also provided a separate quote directly to the plaintiff.  *Id.*  After the purchase was complete, the manufacturer shipped the machine to the plaintiff and installed and trained the plaintiff's employees on its use.  *Id.*  One of the manufacturer's employees also testified that it dealt directly with customers to ascertain their particular needs.  *Id.*  Based on the manufacturer's extensive and active participation in the underlying sales transaction, the court held privity existed between the consumer and manufacturer, finding that the distributor acted merely as the defendant's agent to help facilitate the sale of the machine.  *Id.* at 5.

Here, Williamson alleges "Defendant controlled all aspects of the design, ingredient selection, manufacture, marketing, and distribution of the Contaminated Dog Foods, including how it was displayed in retail stores, so the distributors and retailers were merely agents of Defendant."  (SACC ¶ 268.)  There are no allegations, however, demonstrating that Defendant played a role similar to the role the manufacturer in *Mettler-Toledo* when Williamson purchased the Contaminated Dog Foods.  In turn, the Court cannot infer that the retailers were merely acting as Defendant's agent to help facilitate a purported transaction between the Defendant and Williamson.   Indeed, "[i]n the typical situation where the buyer purchases goods from an independent dealer or retailer," as is true here, "the remote manufacturer is not involved in the sales transaction[.]"  *Mettler-Toledo*, 1999 WL 1009721, at *3.  Nor is Williamson's reliance on *Miles* availing because, even in that case, the defendant manufacturer was actively involved in underlying transaction with the consumer.  612 F. Supp. 2d at 926.  Accordingly, the Court finds the agency exception does not apply.

The second exception Williamson invokes is the third-party beneficiary exception.  That exception applies if Williamson was an "intended third-party beneficiary to a contract."  *Norcold, Inc.*, 798 N.E.2d at 628.[13]  "A third-party beneficiary is one for whose benefit a promise is made, but who is not a party to the contract encompassing the promise."  *Bobb Forest Prods, Inc. v.*

---

[13]    Defendant ironically argues that Plaintiffs waived their argument regarding the third-party beneficiary exception as relates to Sebastiano's Florida claim because they failed to address it in their opposition. A thorough reading of Defendant's discussion in its motion reveals that it never raised this issue. Indeed, nowhere in the two paragraphs discussing this issue does it mention Plaintiffs' Florida claim or cites any Florida authority. Because Defendant did not properly raise it, the Court does not reach this issue.

United States District Court
Northern District of California

1    *Morbark Indus., Inc.*, 783 N.E.2d 560, 576 (Ohio Ct. App. 2002) (quoting *Berge v. Columbus*

2    *Cmty. Cable Access*, 736 N.E.2d 517, 532 (Ohio Ct. App. 1999)).  Under the third-party

3    beneficiary test, a party is an intended beneficiary if there is evidence to support that the promisee

4    "intended to directly benefit a third party, and not simply that some incidental benefit was

5    conferred on an unrelated party by the promisee's actions under the contract." *Trinova Corp.*

6    *Pilkington Bros., P.L.C.*, 638 N.E.2d 572, 577 (Ohio 1994).

7          The Court previously concluded Williamson failed to allege facts showing the third-party

8    beneficiary exception applied because the allegations were conclusory.  *In re Big Heart*, 2019 WL

9    8266869, at *29.  Attempting to salvage her claim, Williamson alleges that "[t]he warranties were

10   designed for and intended to benefit the ultimate purchasers of the Contaminated Dog Foods.

11   Plaintiffs were the intended third-party beneficiaries of express and implied warrantie[s] and are in

12   privity of contract with Defendant."  (SACC ¶ 269.)  Defendant contends these allegations are

13   conclusory and do not establish the retailers acted as Defendant's agent.  The Court finds

14   Defendant's argument persuasive.

15         An ordinary downstream consumer transaction where a plaintiff purchases a product from

16   a seller via a third-party retailer without allegations that the seller and retailer intended to benefit

17   the plaintiff is an incidental benefit.  *See Traxler v. PPG Indus., Inc.*, 158 F. Supp. 3d 607, 624-25

18   (N.D. Ohio 2016); *Savett v. Whirlpool Corp.*, No. 12 CV 310, 2012 WL 3780451, at *10 (N.D.

19   Ohio Aug. 31, 2012).  In *Traxler*, the plaintiffs purchased a line of wood resurfacing products

20   manufactured by the defendant from various retailers.  158 F. Supp. 3d at 610-11.  In support of

21   their breach of implied warranty claim, the plaintiffs invoked the third-party beneficiary exception

22   making the bare allegation that they were intended third-party beneficiaries of contracts between

23   the defendant and its retailers.  *Id.* at 623-24.  The district court rejected that argument, explaining

24   that, without more allegations, the plaintiffs' purchases of the products were merely a

25   "downstream consumer transaction."  *Id.* at 625.

26         Here, like the transaction in *Traxler*, Williamson's allegations do not show that her

27   purchases were anything more than "downstream consumer transaction[s]."  158 F. Supp. 3d at

28   625.  She does not allege that Defendant and each retailer entered into a contract intending the sale

                                                    49

of each product to confer some contemplated benefit to Williamson. Therefore, the allegations do not support her theory that she was an intended third-party beneficiary. *See also Savett*, 2012 WL 3780451, at *10 (holding the plaintiffs were not intended third-party beneficiaries because the plaintiffs' purchase of defendant's products through a retailer was "an ordinary downstream consumer transaction")).

Accordingly, the Court DENIES, IN PART, Defendant's motion to dismiss Claim 9 and GRANTS, IN PART, the motion to dismiss Claim 12.

### 5. Fraud Claims.

Defendant also moves to dismiss Plaintiffs' claim for fraudulent concealment under an unidentified state law (Claim 5), Christian's fraud claim under Tennessee law (Claim 14), Collins's fraudulent misrepresentation claim under Maryland law (Claim 19), and Mayo's fraudulent misrepresentation claim under Washington law (Claim 22).

As a preliminary issue, Defendant renews its argument that Plaintiffs claim for fraudulent concealment fails because Plaintiffs have not identified the governing state law. Plaintiffs contend that California law governs this claim brought on behalf of the multi-state class and the thirteen proposed state subclasses. Plaintiffs alternatively contend that if California law does not apply, the law of each of the thirteen states should apply. The Court previously applied California law to this claim.

Upon reconsideration, the Court finds Defendant's argument persuasive. While the basic elements of fraud are likely similar between the thirteen states, "there may be (and very likely are) differences from state to state regarding issues such as the applicable statute of limitations and various equitable defenses." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 781 F. Supp. 2d 955, 966 (N.D. Cal. 2011). It is thus necessary for Plaintiffs to allege which state law governs these claims to allow Defendant a fair opportunity to respond and for this Court to determine whether the claim has been adequately pled. *See In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1101 (N.D. Cal. 2007). Consistent with other courts in this district, the Court concludes Plaintiffs "must specify the state under which" they bring their claims. *TFT-LCD*, 781 F. Supp. 2d at 966; *see also In re Samsung Galaxy Smartphone Mktg. and Sales Practices Litig.*, No. 16-cv-06391-

United States District Court
Northern District of California

United States District Court
Northern District of California

1  BLF, 2018 WL 1576457, at *4 (N.D. Cal. Mar. 30, 2018) (dismissing the plaintiff's common law

2  claims for failure to allege which state law governs); *Romero v. Flowers Bakeries, LLC*, No. 14-

3  cv-05189-BLF, 2016 WL 469370, at *12 (N.D. Cal. Feb. 8, 2016) (same); *In re Static Random*

4  *Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 910 (N.D. Cal. 2008) (same).

5  Accordingly, the Court GRANTS Defendant's motion to dismiss Claim 5.  Because the Court

6  cannot say it would be a futile act, the Court will grant Plaintiffs one final opportunity to amend

7  this claim to identify the state law that governs their fraudulent concealment claim.

8      Defendant moves to dismiss the remaining three fraud claims for failure to allege reliance

9  and causation and for failure to allege knowledge.

10              **a.      Reliance and causation.**

11     Defendant moves to dismiss Christian's fraud claim under Tennessee law (Claim 14),

12  Collins's fraudulent misrepresentation under Maryland law (Claim 19), and Mayo's fraudulent

13  misrepresentation claim under Washington law (Claim 22) for failure to allege reliance.  To

14  prevail on their fraud claims, Plaintiffs must show they relied on Defendant's representation.  *See*

15  *Power & Tel. Supply Co., Inc. v. Suntrust Banks, Inc.*, 447 F.3d 923, 931 (6th Cir. 2006); *Sevidal*

16  *v. Target Corp.*, 189 Cal. App. 4th 905, 928 (2010); *DiFranco v. Green Tomato, LLC*, No. 2305,

17  Sept. Term, 2016, 2018 WL 3202983, at * 10 (Md. Ct. Spec. App. June 29, 2018); *Landstar Inway*

18  *Inc. v. Samrow* 325 P.3d 327, 337 (Wash. Ct. App. 2014).

19     As discussed in Sections E.2.a, E.2.g.ii, the Court finds Collins, Wahl, and Christian

20  sufficiently allege facts to infer they relied on Defendant's representation "100% Complete &

21  Balanced Nutrition."   However, for the same reasons discussed in Sections E.2.g.iii, Mayo fails to

22  allege facts to show she actually relied on Defendant's representation.

23     Accordingly, the Court DENIES, IN PART, Defendant's motion to dismiss Claims 14 and

24  19, and GRANTS, IN PART, Defendant's motion to dismiss Claim 22.

25              **b.      Knowledge.**

26     Defendant also argues Plaintiffs fail to allege knowledge to sustain their claims for fraud

27  and fraudulent misrepresentation.  To prevail on these claims, Plaintiffs must also show that

28  Defendant knew of the falsity of the representation.  *See Power & Telephone Supply Co.*, 447 F.3d

at 931, *DiFranco*, 2018 WL 3202983, at * 10; *Landstar Inway Inc.*, 325 P.3d at 337.  As discussed in Section E.2.c, Plaintiffs sufficiently allege Defendant knew of the pentobarbital contamination when it made the representation "100% Complete & Balanced Nutrition" on the Contaminated Dog Foods.

For this reason, the Court DENIES, IN PART, Defendant's motion to dismiss Claims 14, 19, and 22.

### 6. Negligence Claim.

Plaintiffs bring a negligence claim under an unspecified state law (Claim 30).  Defendant moves to dismiss this claim because Plaintiffs fail to allege which state law governs, and because the economic loss rule bars their claim.  Plaintiffs argue that California law governs this claim, and, alternatively, that they can bring it under the laws of each of the remaining states in which the named Plaintiffs reside.

Upon reconsideration, for the same reasons discussed in Section E.5, the Court concludes Plaintiffs' negligence claim fails for failure to allege which state law governs.  The Court previously granted Plaintiffs leave to amend and noted that if they chose to pursue the negligence claims from the other jurisdictions, they could do so.  *In re Big Heart*, 2019 WL 8266869, at *25 n. 17.  Because Plaintiffs did not specifically assert negligence claims from other jurisdictions, and because the parties did not brief the viability of those negligence claims for other jurisdictions, the Court declines to address the claims under any other state law.

For this reason, the Court GRANTS, IN PART, Defendant's motion to dismiss Claim 30.  Because the Court cannot say it would be a futile act, the Court will grant Plaintiffs one final opportunity to amend the negligence claims.  However, if Plaintiffs choose to amend, they must specify the state law under which they bring that claim.

#### a. Economic loss rule.

Assuming Plaintiffs bring this claim under California law, the Court will also address Defendant's contention that the economic loss rule bars Plaintiffs' negligence claim.  The parties neither dispute that Plaintiffs suffered only an economic harm nor dispute that the economic loss rule applies.  Instead, the parties disagree about whether the "special relationship" exception saves

United States District Court
Northern District of California

1    Plaintiffs' claim from the economic loss rule.

2         To find a special relationship exists, the Court must weigh six factors: "(1) the extent to

3    which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the

4    plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the

5    connection between the defendant's conduct and the injury suffered, (5) the moral blame attached

6    to the defendant's conduct and (6) the policy of preventing future harm." *J'Aire Corp. v. Gregory*,

7    24 Cal. 3d 799, 804 (1979). Plaintiffs argue all six factors weigh in favor of finding a special

8    relationship. Defendant only addresses the first factor and neglects to address the remaining five

9    in its motion and reply.

10        As to the first factor, the Court previously concluded that the ACC's allegations were

11   insufficient to establish that Plaintiffs were intended beneficiaries. *In re Big Heart*, 2019 WL

12   8266869, at *25. Defendant again argues that the allegations do not support that Plaintiffs were an

13   intended beneficiary but rather merely show this was just a traditional consumer relationship.

14   Plaintiffs disagree, contending that Defendant's actual knowledge its conduct would directly affect

15   them is enough to demonstrate they were an intended beneficiary.

16        To satisfy this factor, Plaintiffs must show that the relevant transaction was intended to

17   affect them in a particular way, different from all other consumers. *See Greystone Homes, Inc. v.

18   Midtec, Inc.*, 168 Cal. App. 4th 1194, 1230-31 (2008). "The first factor alone may be

19   dispositive[.]" *NuCal Foods, Inc. v. Quality Egg LLC*, 918 F. Supp. 2d 1023, 1030 (E.D. Cal.

20   2013); *see also Fieldstone Co. v. Briggs Plumbing Prods., Inc.*, 54 Cal. App. 4th 357, 368-69

21   (1997) (finding that the plaintiff was not an intended beneficiary dispositive)). None of the

22   allegations support a reasonable inference that Defendant contemplated, let alone intended, to

23   affect Plaintiffs in a particular way that is different from how it intended to benefit all other

24   consumers. *See also Nucal Foods*, 918 F. Supp. 2d 1023 (holding the defendant's egg sales were

25   not intended to affect the plaintiffs differently than other similarly situated purchasers); *Ott v.

26   Alfa-Laval Agri, Inc.*, 31 Cal. App. 4th 1439, 1455-56 (1995) (finding defendant's milking system

27   was not intended to affect the plaintiffs any differently than all other consumers)). Because "the

28   absence of this foundation precludes a finding of 'special relationship,'" the Court need not

United States District Court
Northern District of California

53

United States District Court
Northern District of California

1    address the remaining factors.  *Fieldstone*, 62 Cal. Rptr.2d at 707.

2    Accordingly, the Court GRANTS, IN PART, Defendant's motion to dismiss Claim 30 for

3    failure to allege an exception to the economic loss rule.  In light of this ruling, the Court does not

4    reach the issue of whether Plaintiffs have alleged facts to satisfy each element of the claim or

5    whether the allegations are sufficient to invoke the evidentiary presumption of negligence per se.

6    *See Quiroz v. Seventh Ave. Ctr.*, 140 Cal. App. 4th 1256, 1285 (2006); Cal. Evid. Code § 669(a).

7    ### 7.  Adequacy of Remedy at Law.

8    Defendant moves to dismiss Plaintiffs' request for equitable relief because they have an

9    adequate remedy at law.[14]  Plaintiffs argue they are entitled to equitable relief because they seek

10   relief for different conduct—that is, "[t]hey seek economic damages for past misdeeds and

11   injunctive relief to prevent future misdeed."[15]  (Opp. at 34.)

12   A federal district court sitting in diversity, as this Court is here, "must apply traditional

13   equitable principles before awarding restitution[.]"  *Sonner v. Premier Nutrition Corp.*, 971 F.3d

14   834, 841 (9th Cir. 2020).  Under these principles, Plaintiffs may seek equitable relief when there is

15   no adequate remedy at law.  *Barranco v. 3D Sys. Corp.*, 952 F.3d 1122, 1129 (9th Cir. 2020).  The

16   important inquiry here is: does Plaintiffs' requested legal remedy adequately compensate them for

17   their alleged past and future harms?  *See Sonner*, 971 F.3d at 844; *see also*

18   *IntegrityMessageBoards.com v. Facebook, Inc.*, No. 18-cv-05286-PJH, 2020 WL 6544411, at *5-

19   7 (conducting separate analysis for past harm and future harms)).

20   Because the Court finds that Plaintiffs do seek relief for past and future harms, each will be

21   analyzed separately.  For their past economic harms, Plaintiffs seek both damages and equitable

22   _____

23   [14]    This argument impacts Plaintiffs' claims under the FAL (Claim 2) and UCL (Claim 3);
     Collins's fraudulent misrepresentation claim (Claim 19) and breach of express warranty claim
24   (Claim 20) under Maryland law; Mayo's WCPA claim (Claim 21) and her claims for fraudulent
     misrepresentation (Claim 22) and breach of express warranty (Claim 23) under Washington law;
25   Jilek's claims under the MCFL (Claim 24), MUTPA (Claim 25), MFSAA (Claim 26), MPCFA
     (Claim 27); and Schirripa's claims under the NYDAPA (Claim 28) and NYFAA (Claim 29).

26   [15]    Plaintiffs again raise the same threshold argument that Rule 12(g)(2) bars Defendant from
27   raising a new argument in a successive motion to dismiss.  The Court finds this argument is not
     the type of argument that can be waived for failing to raise it in an earlier motion to dismiss.  *See*
28   Fed. R. Civ. P. 12(h).  Accordingly, the Court concludes Defendant has properly raised this
     argument.

54

relief in the form of restitution and disgorgement.  If Plaintiffs prevail on their claim for damages, they would be fully compensated for these economic harms and restitution or disgorgement would be unnecessary.  Plaintiffs do not allege or explain why damages would be an inadequate remedy at law.  *See also Sonner*, 971 F.3d at 844 (affirming district court's ruling that plaintiff's request for damages was an adequate legal remedy at law); *Huu Nguyen v. Nissan N. Am., Inc.*, No. 16-CV-05591-LHK, 2017 WL 1330602, at *5 (N.D. Cal. Apr. 11, 2017) (same)).

For these reasons, the Court GRANTS Defendant's motion to dismiss Plaintiffs' request for restitution and disgorgement for Claims 2, 3, and 19-29 for failure to allege an inadequate remedy at law.

As for their future harms, the Court cannot conclude that damages would be an adequate remedy at law.  The Court must ask, as it did with the issue of restitution, whether damages would adequately compensate Plaintiffs for their future harm of being unable to rely on the truthfulness of Defendant's packaging, absent corrective changes.  In *IntegrityMessageBoards.com,* for example, the plaintiff alleged that Facebook knowingly misrepresented the accuracy of its advertising services to the latter's users.  2020 WL 6544411, at *1, 7.  Though the plaintiff desired to resume advertising on Facebook, the plaintiff alleged it could not do so until it could rely on Facebook's representation about the accuracy of Facebook's ad targeting.  *Id.* at *7.  The plaintiff sought injunctive relief to prevent Facebook from displaying the plaintiff's ads to audiences the parties did not agree to target.  *Id.* at *1, 7.  The district court held that damages were not an adequate legal remedy for future harm because there was "no factual basis to quantify [the plaintiff's] actual damages for future harm," such as how many advertisements the plaintiff would purchase or how much the defendant would charge for such purchases.  *Id.* at *7.  Such a calculation, the district court explained, was further complicated by the problem of proof at the motion to dismiss stage.  *Id.*  Importantly, the district court rejected Facebook's argument that injunctive relief is barred because the plaintiff relies on facts that overlap with the latter's legal claims, explaining that the plaintiff's injunctive relief partially rests on future harm.  *Id.*

Here, like in *IntegrityMessageBoards.com*, there are no factual allegations in the SACC that would allow the Court to quantify Plaintiffs' actual damages for their alleged future harm.

1     Plaintiffs allege a desire to purchase "these products in the future if they can be assured that the

2     Contaminated Dog Foods are properly unadulterated pet food and meet the advertising claims."

3     (SACC ¶ 166.)  But based on Defendant's inaction to take the necessary precautions to ensure its

4     products do not contain pentobarbital, Plaintiffs allege they cannot "rely on the truthfulness of the

5     packaging, absent corrective changes to the packaging and advertising of the Contaminated Dog

6     Foods." (*See, e.g., id.* ¶ 81.)  As in *IntegrityMessageBoards.com*, there is nothing in the record

7     from which the Court could infer how many of the Contaminated Dog Foods Plaintiffs plan to

8     purchase in the future or how much Defendant would charge for those products.  The Court thus

9     cannot conclude that damages would be an adequate remedy at law for Plaintiffs' alleged future

10     harms.

11        Accordingly, the Court DENIES, IN PART, Defendant's motion to dismiss Claims 2, 3,

12     18-23, and 25-29.

13        **8.      Punitive Damages.**

14        Plaintiffs request punitive damages under the CLRA (Claim 1), ICFA (Claim 10),

15     NYDAPA (Claim 28), and NYFAA (Claim 29), and for fraudulent concealment (Claim 5). The

16     parties agree that punitive damages are unavailable for Claims 28 and 29.  Accordingly, the Court

17     GRANTS Defendant's motion to dismiss Plaintiffs' request for punitive damages under Claims 28

18     and 29.

19        Defendant argues Plaintiffs fail to sufficiently allege facts to show they are entitled to

20     punitive damages.  Courts in this circuit are split over whether a defendant can move to dismiss a

21     request for punitive damages on a Rule 12(b)(6) motion.  *Compare Panoyan v. Regalo Int'l LLC*,

22     No. CV 19-07469 PA (SKx), 2019 WL 8758897, at *4 (C.D. Cal. Oct. 25, 2019) (denying the

23     defendant's motion to dismiss the plaintiff's request for punitive damages), *with Sturm v.*

24     *Rasmussen*, No.: 18-CV-01689-W-BLM, 2019 WL 626167, at *4 (S.D. Cal. Feb. 14, 2019)

25     (holding punitive damages cannot be dismissed under a Rule 12(b)(6) motion because punitive

26     damages are not a claim for relief); *Hennighan v. Insphere Ins. Solutions, Inc.*, No. 13-cv-00638-

27     JST, 2013 WL 1758934, at *6 (N.D. Cal. Apr. 24, 2013) (expressing skepticism about whether

28     Rule 12(b)(6) applies to claims for punitive damages)).  Because punitive damages do not "control

United States District Court
Northern District of California

56

1  or even pertain to the sufficiency of any claim," *Oppenheimer v. Sw. Airlines Co.*, No. 13-CV-

2  260-IEG (BGS), 2013 WL 3149483, at *3 (S.D. Cal. June 17, 2013), the Court declines to reach

3  this issue and defers its ruling until summary judgment or trial.

4      Accordingly, the Court DENIES Defendant's motion to dismiss Plaintiffs' request for

5  punitive damages for Claims 1, 5, and 10.

6      **9.    Choice-of-Law.**

7      Defendant argues that a choice-of-law analysis bars Plaintiffs from bringing their

8  California claims on behalf of the multi-state classes.  Although the parties dedicate more attention

9  to this issue, the Court concludes the briefing still is inadequate to enable the Court to engage in a

10  thorough comparative analysis between the differences in the laws and interests of the various

11  states.[16]

12

_____

13  [16]    Anticipating that the parties will renew their arguments at the class certification stage, the
    Court will note why the briefing is inadequate with hopes that the parties will adequately address

14  these issues then.

15      To begin, Defendant, in a conclusory fashion, states that "material differences exist as to
    the types of damages and remedies available, as well as the governing statutes of limitations,"

16  regarding the consumer protection claims.  (Mot. at 48.)  While Defendant has identified authority
    showing that other courts have reached this conclusion, it does not identify the exact case law or

17  statutes that would allow the Court to form its own informed and independent conclusion about
    these differences.  Moreover, Defendant also fails to explain why these differences would make a

18  difference in this lawsuit.  Second, Defendant has provided contradicting arguments and authority
    as to its argument on reliance.  In its choice-of-law argument, Defendant notes there are

19  differences between the states on whether reliance needs to be proved.  However, the authority
    Defendant cites contradicts its earlier argument that all the consumer protection statutes require

20  actual reliance.  (*Compare* Mot. at 48-49, with *id.* at 21-26.)  Even more important, as the Court's
    prior analysis on this issue shows, the parties need to identify which state law claims require either

21  reliance or simply require causation.  Moreover, if there are these distinctions, Defendant must
    explain why they are material to this lawsuit.  Third, Defendant concludes that the states differ on

22  whether Plaintiffs need to prove that its misrepresentation was material but cites only two cases
    from Florida and New York and does not address the remainder of the state law claims.  Fourth,

23  Defendant briefly mentions that some of the states require proof of scienter.  Unsurprisingly,
    again, Defendant provides little authority comparing the respective state law claims.

24      Defendant's analysis regarding the express warranty and implied warranty claims fare a

25  little better.  Regarding Plaintiffs' fraudulent concealment and negligence claim, Defendant
    provides authority from other courts that conclude these claims vary in material ways from state to

26  state.  These conclusions, however, again do nothing to inform this Court about the exact
    distinctions to allow it to make its own independent judgment.

27      Lastly, in a mere three sentences, Defendant concludes that the other states' interests

28  would be impaired if California law is applied, but it does not identify the interests of these other
    states, nor how those interests would be impaired if California law applied.

Accordingly, the Court DENIES Defendant's motion to dismiss Plaintiffs' California claims brought on the multi-state classes. The parties may renew their arguments at the class certification stage.

//

---

The parties are encouraged to fully address these issues if raised in a subsequent motion. Nor should the parties construe the Court's comments above to be exhaustive. The Court reminds the parties that they must provide the legal authority and analysis in order for this Court to engage a full comparative choice-of-law analysis. While the parties' briefing is a step in the right direction, it still is not enough.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS, IN PART, and DENIES, IN PART, Defendant's motion to dismiss.  If Plaintiffs file an amended complaint, they shall do so by no later than April 21, 2021.

If Plaintiffs file an amended complaint and if, after reviewing it, Defendant intends to move to dismiss, the Court ORDERS the parties to meet and confer as that term is defined in the Northern District Civil Local Rules, to determine whether they can narrow the issues to be presented in that motion. To allow for this meet and confer process, Defendant may answer or otherwise respond within forty-five (45) days after Plaintiffs file and serve the amended complaint.  The Court also ORDERS Plaintiffs to file a red-line version of any amended complaint as an attachment to that document.

**IT IS SO ORDERED.**

Dated:  April 27, 2021

_____
JEFFREY S. WHITE
United States District Judge